1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF KENTUCKY

3                AT COVINGTON

4            CASE NUMBER: 2:21-CV-00072

5

6    JEFFREY CUNDIFF                    PLAINTIFF

7          vs.

8    DOUGLAS ULLRICH AND MARK          DEFENDANTS
     RICHARDSON
9

10                       - - -

11        Deposition of DOUGLAS ULLRICH, a Defendant

12   herein, taken by the Plaintiff as upon

13   cross-examination, pursuant to the Kentucky Rules of

14   Civil Procedure and pursuant to Notice to Take

15   Deposition and agreement by counsel as to the time

16   and place and stipulations hereinafter set forth, at

17   the offices of Adams Law, PLLC, 40 W. Pike Street,

18   Covington, Kentucky, at 10:31 a.m., on Tuesday,

19   August 23, 2022, before Kelly Steidle Brabender, a

20   Court Reporter and Notary Public within and for the

21   Commonwealth of Kentucky.

22                       - - -

23

24

25

```
 1   APPEARANCES:

 2

 3   On behalf of the Plaintiff:

 4   CHRISTOPHER ROACH, ESQ.
      of
 5   Pugh & Roach
     28 W. 5th Street
 6   Covington, Kentucky  41011-1402

 7   On behalf of the Defendants:

 8   JEFFREY C. MANDO, ESQ.
      of
 9   Adams Law, PLLC
     40 West Pike Street
10   Covington, Kentucky  41011

11                           - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    S T I P U L A T I O N S

2

3        It is stipulated by counsel for the respective

4    parties that the deposition of DOUGLAS ULLRICH, a

5    Defendant herein, may be taken at this time by the

6    Plaintiff as upon cross-examination and pursuant to

7    the Kentucky Rules of Civil Procedure and Notice to

8    Take Deposition; that the deposition may be taken in

9    stenotypy by the Notary Public-Court Reporter and

10   transcribed by her out of the presence of the

11   witness; that the transcribed deposition was

12   submitted to the witness for examination and

13   signature and that signature may be affixed out of

14   the presence of the Court Reporter.

15                          - - -

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2                                        PAGES

 3   Cross-Examination By Mr. Roach:          5

 4

 5                   E X H I B I T S

 6

 7   Referenced only:

 8   Plaintiff's Exhibit No. 1              7

 9   Plaintiff's Exhibit No. 8 (video)     12

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    DOUGLAS ULLRICH

 2   of lawful age, a Defendant herein, being first duly

 3   sworn, as hereinafter certified, was examined and

 4   deposed as follows:

 5                    CROSS-EXAMINATION

 6   BY MR. ROACH:

 7            Q.    Mr. Ullrich, would you state your

 8   name for the court reporter, please?

 9            A.    It's Douglas Ullrich, U-L-L-R-I-C-H.

10            Q.    Okay.  Have you ever given your

11   deposition testimony prior to today, excluding, you

12   know, testifying in court?

13            A.    No.

14            Q.    Okay.  So same rules that I kind of

15   went through with Officer Richardson.  The court

16   reporter is taking down your testimony so any

17   answers that you give, make sure that you give

18   verbal answers.  Okay?

19            A.    Yes, sir.

20            Q.    So if there's any yes or no, just

21   make sure you say yes or no.  Obviously, you're

22   allowed to, any time you need to, expound on any

23   answers.  Okay?

24            A.    Yes.

25            Q.    If you don't understand a question
```

1    that I'm asking or you think that you don't

2    understand a question that I'm asking, stop me and

3    have me clarify the question.  Okay?

4              A.   Will do.

5              Q.   You're welcome to take a break at any

6    time for any reason, just let me know.  Just the one

7    kind of rule that I have with that is just make sure

8    you finish answering any question that's been asked

9    prior to taking the break.

10             A.   Yes, sir.

11             Q.   And you're also doing well with this,

12   just make sure you let me finish my question before

13   you answer, and I'll let you finish your answer

14   before I ask you another question.

15             A.   Yes, sir.

16             Q.   Thank you.

17             Okay.  Any reason you can't be

18   truthful today?

19             A.   No.

20             Q.   Have you seen a copy of the complaint

21   that was filed in this case?

22             A.   I have.

23             Q.   When did you first see it?

24             A.   I don't recall.  It's been several

25   months.

1          Q.   Have you reviewed anything to prepare

2     for the deposition today?

3          A.   I have.

4          Q.   What did you review?

5          A.   At least portions of several body

6     camera videos, my dash cam video, the citation,

7     CourtNet records, a version of the CAD notes,

8     Officer Richardson's K-9 report.  I believe that is

9     it.

10          Q.   Okay.

11          A.   Mr. Cundiff's deposition as well.

12          Q.   Okay.  Going back to the CAD

13     report -- let me make sure I've got the right one --

14     which was Exhibit 1, it should be in that stack.  So

15     the same thing that I did with Officer Richardson,

16     going back to the last page in that report and the

17     units.  So 265 was your Covington Police Department

18     badge number?

19          A.   That's correct.

20          Q.   Okay.  And then the radio number that

21     you had was 3C68?

22          A.   That's correct.

23          Q.   Is that the number that you always

24     have?

25          A.   Almost always.

1         Q.   Okay.  So the same thing, any time

2    you try to contact another officer or dispatch

3    through the radio, you start with saying something

4    along the lines of 68 or 3 Charlie 68 or 368,

5    something like that?

6         A.   Typically.

7         Q.   Okay.  Is there any other way that

8    you would do it?

9         A.   If I already have the command of the

10   radio, I may not use an identifier, I may just

11   speak.

12        Q.   Okay.  If you go to the one page

13   before that in Exhibit 1, flip one page, and

14   starting at 2:20:45 to 2:20:59, it looks like

15   there's three entries listed as NCIC requests; do

16   you see those?

17        A.   I see those.

18        Q.   And looking over it, it looks like

19   those were actually entered by you into the CAD

20   system?

21        A.   I believe that's what that indicates,

22   I'm not entirely certain.

23        Q.   Okay.  So, I guess, typically, when

24   you stop a vehicle, it would be normal to call in to

25   dispatch with the make, model and license plate

1    number?

2            A.    Yes.   That is not what that is

3    though.

4            Q.    Okay.   And then after you make

5    contact with them, when you're getting ready to

6    prepare your report you -- or not necessarily

7    prepare your report, but as you're conducting the

8    traffic stop, you would go to the computer that's in

9    the cruiser, and then you could search his

10   information, basically put in a request to get this

11   information?

12           A.    That's correct.

13           Q.    Okay.   And so with the NCIC request,

14   you're just looking to see -- so specifically with

15   the vehicle, looking to see if the vehicle is

16   reported stolen?

17           A.    When we run a vehicle through NCIC, a

18   whole bunch of things come back.

19           Q.    Okay.   So what's the normal items

20   that would come back when a vehicle is run through

21   NCIC?

22           A.    If I run a vehicle by its license

23   plate and state, it will come back with its status

24   as whether or not it's stolen or, otherwise, has an

25   NCIC hit for known offender or, otherwise, wanted.

1    It will come back with the registration information.

2    It will come back with any prior calls where that

3    tag is attached to.  It may come back with EPOs or

4    DVOs.  I'm sure there's a longer list than that, but

5    those are the most typical that I think I see.

6             Q.   Sure.  As far as this request goes

7    for the vehicle that you did through NCIC, do you

8    recall getting any sort of information back

9    regarding the vehicle from any of that -- well, I

10   guess, specifically, do you recall any reports of it

11   being stolen, any outstanding EPOs, anything like

12   that?

13            A.   It was not stolen.

14            Q.   Okay.

15            A.   I don't recall whether or not there

16   was an EPO or a DVO or any other information.

17            Q.   Okay.  And then for the other two

18   requests, it looks like you did requests on

19   Ms. Sprague and Mr. Cundiff, do you recall any

20   information that you received back from the

21   requests?

22            A.   Neither of them had warrants.  I

23   don't have any specific recollection as to whether

24   or not they had prior incidents or anything specific

25   to them as individuals.

1          Q.   So specifically for Mr. Cundiff, if

2    you had done an NCIC request with his name and

3    identifying information, would you have received

4    back information related to previous criminal cases?

5          A.   If I run his name through the

6    computer in the car, through the dispatch, the CAD,

7    it will come back with his warrant status, his -- if

8    he has a driver's license or an ID, it will come

9    back with his registration status, whether or not he

10   has a driver's license.  On that driver's license

11   return, it will return -- it will have attached to

12   that screen any prior traffic convictions.  And then

13   through that CAD system, any call that he was

14   attached to previously would also populate.

15         Q.   And just sitting here today, you

16   don't -- you could probably tell he didn't have a

17   warrant because if he had a warrant, you would have

18   arrested him, right?

19         A.   Certainly.

20         Q.   But besides that, you don't recall

21   anything else that was returned on him from that

22   NCIC request, right?

23         A.   I don't.

24         Q.   You do them all the time, it's pretty

25   standard for any traffic stop, right?

1      A.   It's the only way to get a driver's

2  status back.

3      Q.   If you go to Page 2 of that exhibit,

4  for the entry that's at 2:54:58 a.m., there's a

5  narrative added.  Just the only question I really

6  have, is that a narrative that you added to the CAD

7  system?

8      A.   Yes.

9      Q.   I'm going to go to Exhibit 8, which

10 would be your dash cam and your body cam from that

11 night.  Did you say that you reviewed the entirety

12 of your body cam footage?

13     A.   I've reviewed the entirety of my body

14 cam and portions of several other cameras.

15     Q.   Okay.  So just for the record, this

16 will be from Exhibit 8, which is file Extraction

17 1.1_TS.  I told you the wrong one.  This is

18 Extraction 1.1_TS-2.

19          Okay.  So this is starting from --

20 time on the video is 7:08, timestamp is 6:18:35.

21          MR. MANDO:  Can we clarify, is this

22 from Officer Ullrich's body-worn camera footage or

23 from another officers?

24          MR. ROACH:  The two videos that I'll

25 be showing him are from his body cam footage and his

1    dash cam.

2              MR. MANDO:  Okay.  Thanks, Chris.

3              MR. ROACH:  I don't think I'll be

4    going into any other ones.

5              (Video playing.)

6    BY MR. ROACH:

7              Q.   That's stopping at 7:23, timestamp

8    6:18:50.  You recall at some point Mr. Cundiff made

9    a comment about you being a dick sucker, right?

10             A.   He did.

11             Q.   Okay.  And then here he's trying to

12   say something along the lines that he works for

13   Covington, too, we're on the same team?

14             A.   He said, yes, he works -- we're on

15   the same team.

16             Q.   Okay.  And your statement to him is,

17   well, I'm a dick sucker so we're probably not on the

18   same team, right?

19             A.   That's what I said.

20             Q.   Okay.  Fair to say that Mr. Cundiff's

21   statement annoyed you, at least to some degree?

22             A.   No.  I found it amusing.

23             Q.   And I'm assuming that from

24   Mr. Cundiff's statements about working for

25   Covington, that he was, you know, using that as some

1  way to get some sort of -- or you thought that he

2  was using that to get some sort of beneficial

3  treatment, right?

4          A.   Absolutely.

5          Q.   And I'm guessing in the course of,

6  you know, working for Covington Police Department,

7  it's not unnormal for suspects to call you names,

8  right?

9          A.   Oh, constantly.

10         Q.   Okay.  This is starting at 11:24 on

11  the same video, timestamp 6:22:51.

12              (Video playing.)

13         Q.   So it starts out just you in the

14  cruiser entering information into the mobile data

15  terminal.

16         A.   They're technically MDCs, not MDTs.

17         Q.   And MDC stands for mobile data

18  computer?

19         A.   That's correct.

20         Q.   Okay.  So it looks like 11:34 into

21  the video, timestamp 6:23:01.

22              (Video playing.)

23         Q.   So I was asking about the radio call

24  there.  So that's you calling to 71 to come over to

25  the stop, right?

1           A.   That's correct.

2           Q.   And that's Officer Matthews?

3           A.   I don't have any idea.

4           Q.   If you look at the CAD, it should be

5    on there.

6           A.   According to the CAD report, 71 that

7    night was Officer Matthews.

8           Q.   Is Officer Matthews still with the

9    Covington Police Department?

10          A.   He is.

11          Q.   She?

12          A.   He is.

13          Q.   Okay.  It's my understanding that you

14   had called Officer Matthews over to potentially

15   search the female related to the stop?

16          A.   No.

17          Q.   Okay.  Do you recall what your reason

18   for calling Officer Matthews to the stop was?

19          A.   I don't.

20          Q.   Do you know Officer Matthews' first

21   name; did I ask you that?

22          A.   Sam.

23          Q.   Sam.  So this will be from --

24   starting at 14:07 on the video, timestamp 6:25:35.

25                    (Video playing.)

1          Q.   It's stopping at 6:25:47.  So this is

2    you telling Officer Richardson that you think that

3    Jeff Cundiff may have shoved it or passed it off to

4    Ms. Sprague; is that right?

5          A.   That's correct.

6          Q.   By shoved it, what do you mean?

7          A.   Hidden it on or within his person.

8          Q.   And part of your reason for believing

9    that was because of the amount of time it took for

10   him to stop?

11         A.   No.

12         Q.   Okay.  What was your reason for

13   believing that he had hidden it on or within his

14   person?

15         A.   While he was refusing to stop, he was

16   reaching around in a manner where he was lifting

17   himself up off the seat and appeared to be reaching

18   underneath himself as if he was trying to shove

19   something up into his rectum.

20         Q.   And so specifically, you believe that

21   there's a possibility that he had actually inserted

22   the drugs into his rectum?

23         A.   Yes.

24         Q.   Do you remember asking Officer

25   Richardson to come to the traffic stop?

```
 1                   A.    I did not do that.
 2                   Q.    Okay.  This is the same video from
 3     Exhibit 8, Ullrich's body cam, it is 15:52 into the
 4     video, timestamp is 6:27:20.
 5                         (Video playing.)
 6                   Q.    Okay.  So this is just you asking
 7     Officer Richardson if it was okay to search the
 8     occupants at that point, right?
 9                   A.    Correct.
10                   Q.    And the search that you were talking
11     about -- well, I guess, what kind of search were you
12     asking whether you'd be able to do?
13                   A.    A search of their person.
14                   Q.    For contraband?
15                   A.    Certainly.
16                   Q.    And in the statement, the occupants
17     you're referring to are Ms. Sprague and Mr. Cundiff,
18     right?
19                   A.    That's correct.
20                   Q.    And your reason for -- basically, you
21     wanted to search them because you believed that
22     Mr. Cundiff or maybe both of them had hidden drugs
23     somewhere, right?
24                   A.    I asked Mark because at that point in
25     time that scene belongs to Mark, that's why he
```

```
1    searches the car first.  He is calling the shots at
2    that moment because he has deployed his K-9.  So I
3    didn't want to overstep myself until he gave us the
4    instructions on how to proceed.
5              Q.   But, I mean, at that point, though,
6    you were already -- you wanted to search them to see
7    if they had any contraband on them, right?
8              A.   I believe they did.
9              Q.   So that's a yes, you wanted to search
10   them?
11             A.   Yes.
12             Q.   And then do you know what
13   Mr. Richardson was referring to when he said, so we
14   do it in the right order?
15             A.   Mark has a very specific manner that
16   he conducts vehicle and occupant searches, and his
17   order of preference is vehicle, driver, occupants.
18             Q.   Continuing on pretty much at the same
19   time, this is 16:02 on the video, timestamp 6:27:29.
20                  (Video playing.)
21             Q.   Stopping at 16:44, timestamp 6:28:11.
22   Who was the officer that you're talking to there?
23             A.   Officer Fieger.
24             Q.   How do you spell her last name?
25             A.   It's F, and I'm not sure if it's I-E
```

1   or E-I, I usually flip-flop them, but F-I-E-G-E-R.

2            Q.    Do you recall requesting Officer

3   Fieger to come to the scene?

4            A.    I did not see that on the body cam.

5            Q.    And so, I mean, is it -- just from

6   your recollection, though, you don't recall actually

7   calling Officer Fieger to come to the scene, right?

8            A.    No, I don't recall requesting anyone

9   to come to the scene outside of 71.

10           Q.    So do you have any idea how Officer

11  Fieger decided to come to the scene or was

12  dispatched to the scene?

13           A.    You would have to ask her.

14           Q.    So when performing searches, so not

15  just a Terry stop, a search, to search a female it

16  should be a female officer who searches that female,

17  right?

18           A.    That is not in policy, no.

19           Q.    Okay.  During this conversation I

20  believe you told Officer Fieger that you think it's

21  probably on them, and at least one of the reasons

22  you gave was the time between your lights being on

23  and the time it took them to stop?

24           A.    That's correct.

25           Q.    So is it fair to say that part of the

1   reason was because of that time your lights go on,

2   the amount of time it took them to stop, and then

3   Mr. Cundiff's movements that you saw through the

4   back window?

5            A.   Part of the reason of what?

6            Q.   Sorry, that you believe that he had

7   hid drugs on him?

8            A.   Yes.  So it's the totality of his

9   actions from the time I see him to the time that

10  he's removed from the car.

11           Q.   Okay.  So besides those things that I

12  have just stated, is there anything else that -- any

13  other facts that went into the totality of the

14  circumstances in your mind that made you believe

15  that he had hid drugs on him?

16           A.   When I believe he initially saw my

17  vehicle is when he went down Cavanaugh Street at a

18  high rate of speed, then his refusal to stop despite

19  my sirens, my lights, my air horn, repeatedly

20  hitting the siren, and only stopping after

21  approximately 30 seconds.

22                And then upon contact, his immediate

23  attempts to influence me by telling me that he works

24  for the City of Covington, and then his body

25  language changes once I ignored the fact that he

1    worked in Covington, and becoming belligerent in an

2    attempt to intimidate me.  In addition to his

3    furtive movement, his lifting himself off the seat,

4    his reaching around, his appearance to reach both

5    towards the passenger and his own rear end.  And

6    then as he exited the car, he made a sudden movement

7    towards his waistband.  And that's why he was put in

8    handcuffs.

9              So that in totality led me to believe

10   that there were drugs or weapons specifically on his

11   person or Ms. Sprague's person.

12             Q.   As far as his body language changing,

13   you stated that he became belligerent, any other

14   parts of his body language that changed that made

15   you -- that added to the totality of the

16   circumstances?

17             A.   Sure.  In addition to going from

18   telling me that he was an employee of Covington and

19   attempting to name drop someone, indicators of

20   potential narcotics or drugs or contraband, weapons,

21   anything illicit that he was trying to hide included

22   the manner in which he's sitting, his respiration,

23   his interactions back and forth with me.  Those are

24   not things that we typically write down.  But on the

25   side of the road, it is truly a totality, from the

1  way you breathe to the way you can see your pulse on

2  the side of your head, to the way you hold the

3  steering wheel, to the way you fidget in the car.

4          There are thousands and thousands of

5  different changes in behavior or behaviors in and of

6  themselves that when taken together can indicate

7  deception or an attempt to hide.

8          Q.   Okay.  So just to make sure I've got

9  them all, make sure we aren't missing anything, so

10  the way that he was sitting, how did that change

11  that made you believe that -- that added to your

12  totality of circumstances?

13          A.   I don't recall those specifics from

14  this stop because I've probably had 5,000 stops

15  since then, and because there were not any formal

16  charges, it was not anything that was specifically

17  noted.

18          Q.   Okay.  And so the same thing with

19  respiration, do you recall anything, how that

20  changed?

21          A.   As I just said.

22          Q.   So you believe those were present,

23  but you don't recall how they changed?

24          A.   They are examples of things that I

25  would be looking for.  But as I said, there are

1    thousands of behaviors and actions that may cause me

2    to believe that someone is trying to hide something.

3    On this specific stop, I don't have an independent

4    recollection of what these were because we were not

5    able to locate the drugs and create charges, so they

6    were not put into a report.

7            Q.    Well, I'll just ask you instead of

8    going back.  Do you recall you telling Officer

9    Fieger that Mr. Cundiff was waving you off and

10   actually flipped you off at one point, right?

11           A.    That is what I said.

12           Q.    And that's what happened?

13           A.    It is.

14           Q.    And through all of this, I guess, is

15   it fair to say that you didn't believe Mr. Cundiff's

16   story about not knowing where to stop?

17           A.    No.  He explained that he wanted to

18   stop without blocking a side street, which where we

19   stopped, we blocked.

20           Q.    And so, I mean, I'm just making sure

21   I'm clear on this.  You didn't believe him at the

22   time and you probably still don't believe him now,

23   right?

24           A.    No, absolutely not.

25           Q.    Okay.  This is 16:44 in the video,

1    the timestamp is 16:28:11.

2                    (Video playing.)

3            Q.   Okay.  So stopping at 16:56,

4    timestamp is 6:28:23.  So here, at this point, you

5    state outright that you think it's in his butt,

6    right?

7            A.   That's what I said.

8            Q.   And at that time, that's what you

9    believed?

10           A.   I believe that was most likely

11   something in his rectum, in addition to whatever

12   else there may be in the car.

13           Q.   And one of the reasons you stated

14   here was because of the way he was jumping around?

15           A.   Yes.

16           Q.   This is 16:56 in the same video,

17   timestamp 6:28:23.  And, again, for the record this

18   is Officer Ullrich's body cam.

19                    (Video playing.)

20           Q.   Okay.  So pretty simple question in

21   that 7:11, timestamp 6:28:38, here you basically

22   started helping with the searching of Mr. Cundiff's

23   vehicle, right?

24           A.   I do.

25           Q.   Keep going from the same point.

1              (Video playing.)

2         Q.   So, I guess, real quick, when you say

3    I was worried, do you know what you were referring

4    to?

5         A.   I couldn't really make out what was

6    being said back and forth, but I don't have any

7    recollection of that.

8         Q.   Okay.

9              (Video playing.)

10         Q.   And then around, just prior to

11    timestamp 6:29:16, it looks like you set his wallet

12    up on the roof, and you pulled some money out.  Is

13    there some issue about where some of the money was

14    coming from?  Was there any money that you pulled

15    out from Mr. Cundiff that didn't come out of his

16    wallet?

17         A.   I did not take money out of his

18    wallet.

19         Q.   Well, I mean, just to count it?

20         A.   I don't believe that's what happened.

21    I believe I pulled his ID card out.

22              (Video playing.)

23         Q.   Okay.  So do you know where that

24    money came from?

25         A.   Oh, okay.  Yeah, so that came out of

1    his wallet there.

2        Q.   Okay.  Yeah.  We're not accusing you

3    of stealing anything.  As far as that, do you recall

4    any of the money coming from anywhere, as far as

5    Mr. Cundiff is concerned, besides his wallet?

6        A.   I don't recall whether or not there

7    was any on his seat or floor, but there was no other

8    money on his person.

9        Q.   Okay.  In looking through

10   Mr. Cundiff's wallet, what were you looking for?

11       A.   Drugs.

12       Q.   During the search of the car, I

13   believe that Officer Denny stated that he found some

14   shake in Ms. Sprague's purse.  Did you ever see that

15   shake?

16       A.   No.

17       Q.   Okay.  And then Mr. Richardson stated

18   that he -- during the videos, that he had found a

19   marijuana seed.  Did you ever see that marijuana

20   seed during your search of the car?

21       A.   I don't recall seeing it, no.

22       Q.   If drugs were found during a search,

23   I mean, is it normal to not collect them to destroy

24   them or to put them into evidence?

25       A.   Definably, the fact that it's

 1   marijuana shake, means that it's a quantity that

 2   can't be recovered.

 3             Q.   So what about the marijuana seed?

 4             A.   If it's a single seed, standalone,

 5   no, we would not collect that.

 6             Q.   Okay.  So just for the record, this

 7   is Officer Ullrich's body cam, which is part of

 8   Exhibit 8, this is starting at 28:56 in the video,

 9   timestamp 6:40:24.

10                  (Video playing.)

11             Q.   Okay.  So here you're telling -- I

12   mean, you're basically telling Officer Richardson

13   that you've got shake in her purse so we've got her,

14   right?

15             A.   I'm confirming with him how he wants

16   to proceed.  As I stated, because he deployed his

17   K-9, the charge of that scene is his.

18             Q.   And so just in confirming, your first

19   statement is, basically, we got shake in the purse

20   so we got her, right?

21             A.   That is what I said.

22             Q.   And then Officer Richardson says,

23   well, you've got both, so start with the driver,

24   right?

25             A.   That's what he said.

1    Q.   And so this whole interaction is just

2    you confirming with Officer Richardson that there

3    was probable cause to do the searches, right?

4    A.   I knew there was probably cause to

5    complete the searches, but as I said, he is in

6    charge of that scene at that time so I'm not going

7    to conduct any searches of anyone or anything

8    without his go ahead.

9    Q.   And so after talking to Officer

10   Richardson, basically, you go to search Mr. Cundiff

11   first, right?

12   A.   I believe that's the order.

13   Q.   Yeah.  So same exhibit from Officer

14   Ullrich's body cam, starting time is 29:23,

15   timestamp is 6:40:50.

16   (Video playing.)

17   Q.   Okay.  At timestamp 6:41:07, at this

18   point you're getting Mr. Cundiff up so you can

19   search him, right?

20   A.   That's correct.

21   Q.   And then you ask him if he has

22   anything on him, basically telling him you're going

23   to find it anyway, right?

24   A.   That's correct.

25   Q.   And he denies having anything on him?

1          A.   That's correct.

2               (Video playing.)

3          Q.   So we stopped at 6:41:19 on the

4    timestamp.  So first you ask if Mr. Cundiff has any

5    shorts on underneath his basketball shorts, right?

6          A.   That's correct.

7          Q.   And by that you're asking whether he

8    had another pair of shorts on in addition to any

9    underwear he might be wearing; is that right?

10         A.   Regardless of underwear, whether he

11   was wearing two pairs of shorts.

12         Q.   Okay.  What was the reason for asking

13   if he had two pairs of shorts on?

14         A.   As I explained to him, the jockeys,

15   or underwear that he had on, for whatever reason

16   seemed unusual or not ordinary and I thought they

17   may be shorts.

18         Q.   Okay.  I guess, what are jockeys?

19         A.   Underwear.

20         Q.   Okay.  I mean, I know that's a silly

21   question, but I just want to make sure I have it

22   right.

23              And then in response, Mr. Cundiff

24   says that he's just wearing -- he's not wearing any

25   other shorts under the shorts that he has on?

1              A.    That's what he said.

2              Q.    Continue on from timestamp 6:41:19.

3              (Video playing.)

4              Q.    Okay.  So we're stopped at timestamp

5 6:41:26 on Officer Ullrich's body cam.  So you asked

6 him to spread his legs.  Why did you ask him to

7 spread his legs?

8              A.    I didn't ask him to spread his legs.

9 I asked him to spread his feet.

10            Q.    Spread his feet.  Why did you ask him

11 to spread his feet?

12            A.    In an attempt to dislodge anything he

13 had tucked between his thighs, to put him in a

14 position where it would be more difficult for him to

15 resist, fight or run, and then to prepare to search

16 him.

17            Q.    And in looking at the screenshot

18 there, you can see part of Mr. Cundiff's butt

19 cheeks, right?

20            A.    Sort of.

21            Q.    Let me see if I can find the -- okay.

22 So still looking at the same timestamp, 6:41:26, I

23 think there you can see his butt cheeks and his butt

24 crack, right?

25            A.    I believe that's what that is.

1          Q.    Continuing on from the same time.

2               (Video playing.)

3          Q.    Okay.   Timestamp 6:41:28, you tell

4     him to unclench, man; what are you referring to?

5          A.    His entire body was locked up.  He

6     was squeezing incredibly hard, which is an obvious

7     sign of someone who is trying to hide something in

8     their butt cheeks or within their person or on their

9     body, both from my training and my experience of

10    dozens, if not hundreds, of times of recovering

11    things from people's groin areas with that specific

12    behavior.

13         Q.    Continuing on.

14              (Video playing.)

15         Q.    Okay.   So stopping at timestamp

16    6:41:38, again, you just said, you're squeezing your

17    ass cheeks together, it looks like you're hiding

18    something?

19         A.    That's what I said.

20         Q.    Okay.   So your statement, though, is

21    that the unclench, that you're referring to his

22    entire body and not to his butt cheeks?

23         A.    Well, butt cheeks included, but his

24    whole body is squeezed.

25              (Video playing.)

1          Q.   So this is 30:27 on the same video,

2    just paused at timestamp 6:41:54.  So, to me, it

3    looks like here your hand is actually under

4    Mr. Cundiff's underwear.  Is it under his underwear

5    at that point?

6          A.   I can't tell from this.

7          Q.   At any point did you go put your hand

8    under Mr. Cundiff's underwear during the search?

9          A.   Yes.

10          Q.   Did you ever perform a search under

11    Mr. Cundiff's underwear on his back side?

12          A.   Yes.

13          Q.   Can you describe the search that you

14    were doing under the underwear on Mr. Cundiff's butt

15    cheeks area?

16          A.   You would use a bladed hand to go

17    down the length from the top of the cleft, ridge,

18    whatever you want to call it, but his butt crack,

19    down to the bottom of it, to see if there was

20    anything inside his cheeks that he was trying to

21    hide.  Do not pull them apart.  Do not push through.

22    But just on the exterior of him.

23          Q.   Did any part of your hand touch

24    Mr. Cundiff's rectum?  And I guess I should add,

25    this entire time your hand is gloved?

```
1                   A.   It is.

2                   Q.   But at any point, did any part of

3     your gloved hand touch Mr. Cundiff's rectum?

4                   A.   No.

5                   Q.   And did any part of your hand

6     penetrate Mr. Cundiff's rectum?

7                   A.   Absolutely not.

8                   Q.   And it was your belief at this time

9     that Mr. Cundiff had actually inserted drugs into

10    his rectum, right?

11                  A.   Yes.

12                  Q.   I guess, if you're running a bladed

13    hand down between the butt cheeks, how do you ensure

14    that you aren't contacting a suspect's rectum during

15    that?

16                  A.   Your hand is 90 degrees off.  So you

17    want to go down with your hand against his butt

18    cheeks, but not penetrating his butt cheeks.

19                  Q.   At any time during the search of

20    Mr. Cundiff's back side here, the butt cheeks, did

21    you ever look into his underwear?

22                  A.   Absolutely.

23                  Q.   Okay.  We'll play from the same

24    point, it's 30:27 in the video, starting at

25    timestamp 6:41:54.
```

```
 1                    (Video playing.)
 2              Q.   Okay.  So stopping at timestamp
 3     6:42:13.  So it looks like during that part you had
 4     started to search the front side of Mr. Cundiff; is
 5     that right?
 6              A.   I believe I completed it in those
 7     couple seconds, yes.
 8              Q.   Okay.  And for this search, was your
 9     hand under the underwear?
10              A.   Yes.
11              Q.   Can you describe the search that you
12     performed on Mr. Cundiff's front side?
13              A.   When I search the male's groin, it
14     goes down alongside the, I don't know, the seam
15     between the hip and the groin in case there's
16     anything stuck there, move the scrotum and penis out
17     of the way to check underneath them, and then come
18     up the other side.
19              Q.   Did you put your hand between his
20     penis and his scrotum?
21              A.   I don't believe so.
22              Q.   And then a part of that search,
23     you're searching around his scrotum?
24              A.   I would really describe it as either
25     behind or under, however you want to look at it.
```

1    It's a location that we frequently find drugs.

2            Q.    But doing that search, you're, at the

3    very least, manipulating his scrotum?

4            A.    Yes.

5            Q.    Okay.  We're going to go to the same

6    Ullrich body cam, part of Exhibit 8, 31:50 into the

7    video, timestamp 6:43:18.

8                  (Video playing.)

9            Q.    Okay.  So stopping at timestamp

10   6:43:22, here you state that he won the

11   I-want-it-more game because it's far enough in him

12   that I can't find it, right?

13           A.    That is what I said.

14           Q.    If you believed that the drugs were

15   inside of him, how would that technique, the

16   bladed-hand technique that you were talking about to

17   check his butt cheeks, how would that result in

18   finding any drugs?

19           A.    It wouldn't.

20           Q.    So what was the purpose of performing

21   that search?

22           A.    I believed that to be the area

23   where -- that was one of the areas that I believe he

24   was likely to have stuck drugs.  And very frequently

25   when people stick items into their backside, they

1   just clench it between their butt cheeks, be it

2   needles, knives, drugs, other paraphernalia.

3               So checking the outside -- or I've

4   had positions where large portions of bags were

5   sticking out well past the butt cheeks.  But being

6   that I searched him and could not find it, it was

7   too far inside of him for me to find anything.

8               Q.   This is starting at 31:55, and the

9   video timestamp is 6:43:22.

10              (Video playing.)

11              Q.   So starting at around 6:43:33, you

12  start completing the citation for Mr. Cundiff,

13  right?

14              A.   I started the citation quite a bit

15  before this.  This is the very end of the citation.

16              Q.   Okay.  And so at this point,

17  Ms. Sprague is still being searched, right?

18              A.   I believe that to be the case.

19              Q.   You can kind of see her down on the

20  bottom side with her hair?

21              A.   Yes.

22              Q.   Okay.  So at that point that you were

23  done searching Mr. Cundiff, there was nothing else

24  that you felt you should report in the citation,

25  right?

1          A.   For him?

2          Q.   Yes.

3          A.   After he had been searched?

4          Q.   Yes.

5          A.   Yeah, there was nothing else for him

6     at that point.

7          Q.   Okay.  And so if something had been

8     found on Ms. Sprague, how would that have been

9     handled?

10         A.   It would depend on what was found,

11    what was said, all of that.  I can't answer what

12    ifs.

13         Q.   In the situation where some illicit

14    substance was found on Ms. Sprague, would that

15    normally cause you to start a new citation?

16         A.   For Ms. Sprague?

17         Q.   Yes.

18         A.   Potentially.

19         Q.   So what are the scenarios where it

20    would cause you to start a new citation versus using

21    the citation that was already started?

22         A.   Well, I couldn't give a citation to

23    Ms. Sprague under Mr. Cundiff's citation, period.

24    So it would depend on what was located, the quantity

25    of it.  I mean, it entirely depends.

1          She could have been hiding money.

2    She could have been hiding prescription medications

3    that she has a prescription for.  She could have

4    heroin.  She could have a gun.  She could -- there

5    are too many options to narrow that down.

6          Q.   Do you recall, as you're completing

7    your citation, Officer Richardson saying something

8    along the lines of did you check his shoes, search

9    his shoes?

10          A.   He may have, I don't recall.

11          Q.   Okay.  So same video from Officer

12   Ullrich's dash cam, starting at 33:19, timestamp

13   6:44:47.

14               (Video playing.)

15          Q.   And so just that statement, that you

16   won't find it without a cavity search, that's a

17   statement you made?

18          A.   It is.

19          Q.   Okay.  Who are you making that to, I

20   can't see --

21          A.   Sergeant Mitchell.

22          Q.   And so what wouldn't you find without

23   a cavity search?

24          A.   Whatever it was that he hid up his

25   rectum.

1          Q.    And you believe that to be drugs?

2          A.    Absolutely.

3          Q.    At any point after this you didn't

4    seek a warrant to perform a cavity search on

5    Mr. Cundiff, did you?

6          A.    Only under extreme cases would they

7    grant a warrant of that nature.

8          Q.    And then are there any other facts

9    that you can recall that you relied on in conducting

10   your search of Mr. Cundiff?  I know we went through

11   some of the changes of behavior and stuff like that.

12   I just want to make sure that I've got all of them.

13   That I'm not missing any, that we go to trial and

14   you come up with a list of 50 more or something like

15   that.

16         A.    I believe that is the totality.

17         Q.    So you believe you've said everything

18   that you can think of that would have lended towards

19   your probable cause determination?

20         A.    I believe that's correct.

21         Q.    Okay.  This is the same video from

22   Officer Ullrich's body cam, starting at 35 minutes,

23   timestamp 6:46:28.

24              (Video playing.)

25         Q.    Okay.  So that ended at 35:19,

1    timestamp 6:46:46.  So in that little clip you

2    state, I'm still red; what did you mean by I'm still

3    red?

4              A.    That means my camera is still

5    activated.

6              Q.    And that's because your body-warn

7    camera is supposed to stay on until the suspect

8    leaves the scene or you drop them off at the

9    detention center, right?

10             A.    It stays on until the conclusion of

11   the interaction.  I don't believe I would go so far

12   as to say that it has to stay on until they leave

13   the scene, but until you're done.  I was remaining

14   on until Mr. Cundiff drove away.

15             Q.    Okay.  So the same Exhibit 8,

16   Mr. Ullrich's body cam, starting at 36:40, timestamp

17   6:48:08.

18                   (Video playing.)

19             Q.    Okay.  So just stopping there, it's

20   at 36:49.  You stated, I literally just told them

21   let's chase the car, so what do you mean by "let's

22   chase the car"?

23             A.    I'm one of the senior guys who works

24   at night, and I drive the young officers to be

25   proactive.  And one of the most exciting things we

1    do is stop cars and get into vehicle pursuits.  And

2    I had just had a conversation with someone,

3    apparently, where I had said, let's go find a good

4    car to chase.

5            Q.    And you don't recall who you told

6    that to?

7            A.    I don't.

8            Q.    So overall, just as far as the search

9    of Mr. Cundiff goes, you don't deny that your hand

10   was under Mr. Cundiff's underwear at least two

11   separate times, right?

12           A.    No, that's accurate.

13           Q.    You do deny that you in any way

14   touched his rectum, right?

15           A.    That's correct.

16           Q.    And you also deny that you put your

17   hand between his butt cheeks, right?

18           A.    That's correct.

19           Q.    Okay.  You also agree that there were

20   times where you actually looked down Mr. Cundiff's

21   underwear?

22           A.    Absolutely.

23           MR. ROACH:  I think that's all I

24   have.  Let's take a couple-minute break.

25                (A brief recess was taken.)

42

1              MR. ROACH:  I don't have anything

2      else.

3              MR. MANDO:  I don't have any

4      questions.  We'll take signature, Kelly, on that.

5

6

7

8

9                    _____

10                    DOUGLAS ULLRICH

11

12

13          (DEPOSITION ADJOURNED AT 11:39 A.M.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2    COMMONWEALTH OF KENTUCKY:
      COUNTY OF KENTON          :
 3

 4              I, Kelly A. Brabender, the undersigned, a

 5    duly qualified notary public within and for the

 6    Commonwealth of Kentucky, do hereby certify that

 7    DOUGLAS ULLRICH was by me first duly sworn to depose

 8    the truth, the whole truth, and nothing but the

 9    truth; that the foregoing is the deposition given at

10    said time and place by said witness; that said

11    deposition was taken pursuant to stipulations

12    hereinbefore set forth; that said deposition was

13    taken by me in stenotypy and transcribed by means of

14    computer under my supervision; that the transcribed

15    deposition was submitted to the witness for

16    examination and signature and that signature may be

17    affixed out of the presence of the Court Reporter;

18    that I am neither a relative of any of the parties

19    or any of their counsel and have no interest in the

20    result of this action.

21              IN WITNESS WHEREOF, I have hereunto set my

22    hand and official seal of office at Covington,

23    Kentucky, this 30th day of August, 2022.

24                        /s/Kelly A. Brabender
                  _____

25                  Kelly A. Brabender-Notary Public #KYNP12186
                  My commission expires: September 28, 2024
```