```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF KENTUCKY

 3                      AT COVINGTON

 4              CASE NUMBER: 2:21-CV-00072

 5

 6   JEFFREY CUNDIFF                    PLAINTIFF

 7        vs.

 8   DOUGLAS ULLRICH AND MARK           DEFENDANTS
     RICHARDSON
 9

10                          - - -

11        Deposition of MARK RICHARDSON, a Defendant

12   herein, taken by the Plaintiff as upon

13   cross-examination, pursuant to the Kentucky Rules of

14   Civil Procedure and pursuant to Notice to Take

15   Deposition and agreement by counsel as to the time

16   and place and stipulations hereinafter set forth, at

17   the offices of Adams Law, PLLC, 40 W. Pike Street,

18   Covington, Kentucky, at 9:00 a.m., on Tuesday,

19   August 23, 2022, before Kelly Steidle Brabender, a

20   Court Reporter and Notary Public within and for the

21   Commonwealth of Kentucky.

22                          - - -

23

24

25
```

2

```
 1    APPEARANCES:

 2

 3    On behalf of the Plaintiff:

 4    CHRISTOPHER ROACH, ESQ.
        of
 5    Pugh & Roach
      28 W. 5th Street
 6    Covington, Kentucky  41011-1402

 7    On behalf of the Defendants:

 8    JEFFREY C. MANDO, ESQ.
        of
 9    Adams Law, PLLC
      40 West Pike Street
10    Covington, Kentucky  41011

11

12    Also present:  Douglas Ullrich

13

14                         - - -

15

16

17

18

19

20

21

22

23

24

25
```

<u>S T I P U L A T I O N S</u>

    It is stipulated by counsel for the respective parties that the deposition of MARK RICHARDSON, a Defendant herein, may be taken at this time by the Plaintiff as upon cross-examination and pursuant to the Kentucky Rules of Civil Procedure and Notice to Take Deposition; that the deposition may be taken in stenotypy by the Notary Public-Court Reporter and transcribed by her out of the presence of the witness; that the transcribed deposition was submitted to the witness for examination and signature and that signature may be affixed out of the presence of the Court Reporter.

                       - - -

1                         I N D E X

2                                                    PAGES

3      Cross-Examination By Mr. Roach:              5

4

5                        E X H I B I T S

6      Plaintiff's Exhibit No. 1               8
       Plaintiff's Exhibit No. 2              26
7      Plaintiff's Exhibit No. 3              27
       Plaintiff's Exhibit No. 4              29
8      Plaintiff's Exhibit No. 5              37
       Plaintiff's Exhibit No. 6              45
9      Plaintiff's Exhibit No. 7              48
       Plaintiff's Exhibit No. 8              48

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARK RICHARDSON

1

2   of lawful age, a Defendant herein, being first duly

3   sworn, as hereinafter certified, was examined and

4   deposed as follows:

5                    CROSS-EXAMINATION

6   BY MR. ROACH:

7            Q.   Mr. Richardson, would you state your

8   full name for the record?

9            A.   Mark Richardson.

10           Q.   And then, what rank are you

11  currently?

12           A.   Specialist.

13           Q.   Specialist.  Is it okay if I just

14  call you Officer Richardson?

15           A.   That's fine.

16           Q.   Have you ever given your deposition

17  testimony prior to today?

18           A.   About this case?

19           Q.   Any case.

20           A.   I have given a deposition before,

21  yes.

22           Q.   Do you recall how many times,

23  roughly?

24           A.   No, I don't.

25           Q.   Have any of them related to a civil

1    lawsuit?

2         A.   Yes.

3         Q.   Do you know how often you've been --

4    well, I guess, for those cases where you were giving

5    testimony related to a civil lawsuit, were you a

6    party named in it?

7         A.   Yes.

8         Q.   Okay.  Were there any cases where you

9    gave deposition testimony where you were just a

10   witness?

11        A.   I don't believe so.

12             MR. MANDO:  And you're not talking

13   about criminal cases where he's called to testify as

14   a witness on a regular basis?

15             MR. ROACH:  Right.  Yeah, just

16   deposition testimony.

17   BY MR. ROACH:

18        Q.   So I'm just going to go through kind

19   of ground rules since I don't know how long it's

20   been since your last deposition.  The court reporter

21   is going to be taking down everything that you say.

22   So any time that you answer a question, make sure

23   that it's verbal.  So if there's a question where

24   you would answer yes or no, make sure that you say

25   yes or no and don't just shake your head or say

1    uh-huh or unh-unh.  Okay?

2              A.   Okay.

3              Q.   I ask bad questions all the time so

4    if there's any time where you don't understand a

5    question that I'm asking, make sure you ask me to

6    either repeat it or rephrase it, and I'll do my best

7    to give you a clear question.  Okay?

8              A.   Okay.

9              Q.   Because any time you answer the

10   question, for the record, we're going to be assuming

11   that you understood the question that was asked and

12   that you're answering the question that was asked.

13   Okay?

14             A.   Yes, sir.

15             Q.   Thank you.

16                  And you're doing a good job, just

17   make sure you let me finish my question before you

18   answer and I'll do the same, I'll give you as much

19   time as you need to respond to a question before I

20   ask the next question.  Okay?

21             A.   Yes, sir.

22             Q.   And if at any point you feel like you

23   want -- I know your attorney probably told you

24   different, but if at any point you want to add

25   anything to any other previous answers, feel free to

1    chime in and give that answer.  Okay?

2              A.   Yes, sir.

3              Q.   Any reason you can't be truthful

4    today?

5              A.   No, sir.

6              Q.   Have you seen a copy of the complaint

7    that was filed in this case?

8              A.   Yes, sir.

9              Q.   When did you first see it?

10             A.   I don't know.

11             Q.   Have you reviewed anything in

12   preparation for the deposition today?

13             A.   Yes, sir.

14             Q.   And what did you review?

15             A.   The video and my K-9 record.

16             Q.   The video that you reviewed, was it

17   just your video or was it all of the -- I think

18   overall I've got five videos.  One is a dash cam and

19   the other four are body cam.  Did you review just

20   yours or did you review some portion of the others?

21             A.   Just mine.

22               (WHEREUPON, Plaintiff's Exhibit No.

23   1 was marked for identification.)

24             Q.   Okay.  So Exhibit 1, just for the

25   record, it's a five-page CAD report from the service

1    call regarding the traffic stop for Mr. Cundiff.

2    I'm just going to ask you to go to the last page of

3    that report, so it would be the section that's

4    headed Units.

5             A.   Yes, sir.

6             Q.   Okay.  So just looking at that, under

7    Personnel, 0202 Richardson, that's you, right?

8             A.   Yes, sir.

9             Q.   Okay.  What does 0202 refer to?

10            A.   That's my badge number.

11            Q.   Okay.  And then the radio number,

12   which is 3C91, what does that refer to?

13            A.   That is our unit number or our call

14   number.

15            Q.   Okay.  And so kind of my

16   understanding is when you're using the radio, you

17   would use -- if you were going to get on the radio

18   at that point, you would basically just press the

19   button and say something along the lines of 91,

20   right?

21            A.   91 or 3 Charles 91 or 391.

22            Q.   Okay.  Can you say that one more

23   time?  It was too fast for me to --

24            A.   91, 3 Charles 91, or 391.

25            Q.   And so any time that you're using the

1    radio through dispatch, that's just a way to let the

2    dispatcher and the other officers know that it's you

3    who's the one that is actually chiming in that's

4    going to be saying something, right?

5              A.   If I'm running that unit number, yes.

6              Q.   Okay.  Does the radio number stay the

7    same every shift or does it change?

8              A.   For me, it stays the same.

9              Q.   So on the night of June 8 -- well, I

10   guess we'll say the early morning hours of June 8,

11   2020, you were a specialist running a K-9 unit,

12   right?

13             A.   That's correct.

14             Q.   Okay.  Do you recall how you became

15   involved in the stop with Mr. Cundiff?

16             A.   No.

17             Q.   Would it be normal for -- I guess,

18   would it be normal for you to just respond to an

19   active traffic stop to see if there's any need for

20   you to, you know, run a dog or assist in any other

21   way?

22             A.   Yes.

23             Q.   So in this case, it's not necessarily

24   that Mr. Ullrich or any other officers called you,

25   you would have just showed up, right?

 1            A.   I don't know if they called me that
 2    night or not.
 3            Q.   Okay.  But I guess either way it
 4    could happen, you could either be called or you
 5    could just decide to show up?
 6            A.   Correct.
 7            Q.   What is the name of the K-9 that you
 8    were using in 2020 in your routine as far as being
 9    a Covington police officer?
10            A.   Zino, Z-I-N-O.
11            Q.   And it's my understanding that Zino
12    was obtained by the police department sometime in
13    2016?
14            A.   Correct.
15            Q.   Okay.  When did you first complete
16    your patrol and narcotic training with Zino?
17            A.   End of 2016, beginning of 2017.
18            Q.   What narcotics is Zino trained to
19    indicate on?
20            A.   Marijuana, meth, heroin, cocaine, and
21    any derivative thereof.
22            Q.   The certification that -- well, I
23    guess I should ask you, the certifications, are they
24    for the dog specifically or is it for you and the
25    dog as a unit?

1          A.   It's a team.

2          Q.   A team.  The certification that Zino

3     has, that's through the NAPWDA?

4          A.   Correct.

5          Q.   After you and Zino were first

6     certified for narcotics, for the patrol and narcotic

7     training, are those certifications renewed each

8     year?

9          A.   Yes.

10          Q.   When was the last time you went

11     through recertification for patrol and narcotic

12     training with Zino?

13          A.   It should have been September of '21.

14          Q.   As part of those certifications, is

15     there a test that's supposed to be completed?

16          A.   Yes.  Yes.

17          Q.   Okay.  Has Zino -- you and Zino ever

18     failed any portion of one of the NAPWDA

19     certification tests?

20          A.   NAPWDA certification test?  You say

21     PWDA, you forgot the N.  It's NAPWDA.

22          Q.   Say it one more time.  NAP --

23          A.   North American Police Working Dog

24     Association, so NAW -- NAPWDA, yeah.

25          Q.   So have you and Zino ever failed any

1    portion of the certification tests or any of the

2    recertification tests?

3             A.   No.

4             Q.   Okay.  Have you ever been allowed to

5    retake part or all of the certification tests or

6    recertification tests?

7             A.   No.

8             Q.   How many hours of maintenance

9    training does Zino receive per month?

10            A.   Twenty-four, minimum.

11            Q.   Is it broken down into a weekly

12   requirement or is it just 24?

13            A.   We train six hours a week minimum.

14            Q.   So kind of my understanding of how

15   drug detection dogs work, that there's kind of a

16   two-part process to the actual positive indication.

17   So I'm just going to kind of explain what I --

18   explain it so I can kind of let you know -- I don't

19   know what your terminology for these are so I want

20   to make sure that I got that right.

21                So my understanding is that the first

22   thing that a dog would do would be an alert that

23   there might be something present, which is a natural

24   response.  It might also be called a change of

25   behavior.  And then after the dog is positive, you

1    know, makes an actual identification, says that

2    there's a drug there, that there would be an actual

3    indication which is a trained response.  Is that

4    basically how it goes?

5          A.    Pretty close, yeah.

6          Q.    Okay.  So for that first part, the

7    change of behavior, for your terminology, what do

8    you call that?

9          A.    A change in behavior can be a number

10   of things.  Change of behavior is anything that's

11   not inside the norm of the dog's behavior.  So

12   slowing down the sniff; closing their mouth to

13   sniff; turning their head, going in one direction,

14   turning their head and going back; jumping up into

15   the window of a car.  Those are some of the changes

16   of behavior.  I mean, there's a list of them.

17         Q.    Okay.  And so just to make sure I've

18   got it right, when you're saying change of behavior,

19   is that basically the same thing I was talking about

20   before as being an alert?

21         A.    Change of behavior is a behavior

22   that's displayed that's different than their norm

23   while training.

24         Q.    Okay.  What is -- how would you

25   define alert as far as drug detection goes?

1    A.   There's several different types of

2  alerts, depending on how your dog is trained.

3    Q.   Give me an example of what an alert

4  is.

5    A.   Well, it used to be scratching the

6  car, or sitting on a car, and then there's focus.

7    Q.   So for Zino, what are his specific --

8  the changes of behaviors that you would expect to

9  see during the course of a search where you end up

10 finding drugs?

11   A.   Any of the things I've just described

12 could be a change of behavior that could be

13 displayed.

14   Q.   So all of those included, those are

15 all different changes in behavior that Zino has?

16   A.   Those are all changes in behavior

17 that could be displayed during the course of a

18 narcotic search.

19   Q.   Okay.  Well, would you mind giving me

20 a list of the ones that you -- in your experience

21 with Zino, the different changes of behavior that

22 you've seen while you've been working with him?

23   A.   Raising his head; jumping in a car

24 window; change in direction; closing his mouth while

25 he's breathing to sniff; slow detailed sniff.  I

1    mean, I'm sure there's something else, but --

2    climbing under a car; standing on his back legs to

3    go follow odor.

4              Q.   Okay.  Then as far as the kind of

5    final alert where Zino is telling you that he thinks

6    that there's drugs, or he's sensing the presence of

7    narcotics at a location, what type of alert does he

8    have?  Does he have a passive alert?

9              A.   Yes.

10             Q.   Okay.

11             A.   Depends on what you define as passive

12   though.

13             Q.   So can you go through what his actual

14   final alert is?

15             A.   He is a focus dog.  So he stops, body

16   becomes rigid, and normally his nose is touching

17   where the source is.

18             Q.   And you're saying it depends on what

19   you define as passive.  For the indication, the

20   final alert that Zino does, how do you define

21   that as --

22             A.   Focused.

23             Q.   It's a focused alert?

24             A.   Sorry.  I didn't mean to interrupt.

25             Q.   No, you're fine.  So you would, in

1    your terminology, the way that you describe it, it

2    would be just a focused alert?

3              A.   Correct.

4              Q.   All right.  And it's not to say that

5    a focused alert could also technically be somewhat

6    aggressive and it could be passive?

7              A.   Aggressive would require scratching;

8    my dog doesn't scratch.

9              Q.   When Zino positively indicates the

10   presence of narcotics during a search, is there any

11   sort of a duration that you expect him to maintain

12   that alert, that indication, whatever you want to

13   call it?

14             A.   He alerts to the odor of narcotics.

15   There's a difference.

16             Q.   Okay.  So when he alerts to the odor

17   of narcotics, do you expect him to maintain his

18   focused alert for any certain duration?

19             A.   No.

20             Q.   When Zino becomes rigid, when he's

21   saying that he's detected the odor of narcotics, can

22   you describe how he becomes rigid?

23             A.   His body locks up.

24             Q.   I mean, anything else you can

25   describe for it?  I mean, is his tail wagging?

1         A.    His body locks up, and it depends on

2    where the odor is depending on how he becomes rigid.

3    Meaning, if it's low, sometimes he lays down.  If

4    it's nose height, he locks up standing up.  And if

5    it's up high, he'll stand on his hind legs.  So

6    there's no -- it's not like a traditional passive

7    dog that sits.

8         Q.    Sure.  So when you're saying that he

9    locks up, I mean, would his tail still be moving?

10   If his tail was still moving, would you consider

11   that to be an alert?

12        A.    Usually his tail doesn't wag.

13        Q.    So it's still a question though.  If

14   his tail is wagging during a search for the odor of

15   narcotics, would you consider that to be his body

16   locking up?

17        A.    If his tail was wagging and the rest

18   of his body is rigid, then I would say, yes, he's

19   locked up.

20        Q.    Do you have any command that you use

21   to get him to release that focused alert?

22        A.    I just tell him, okay, good boy.

23        Q.    So I mean, part of this, when Zino's

24   making what you think is an indication or alerting

25   between this focused alert, how do you differentiate

1   those times where -- I guess, how would you tell

2   that he's actually alerting, doing a focused alert,

3   and not just pausing to continue to smell or

4   evaluate?

5           A.   He locks up.  He's rigid.

6           Q.   If you were to pull on a leash while

7   he's locked up, would he move?

8           A.   Nope.

9           Q.   Do you use a leash in any way to

10  figure out whether or not he actually is locked up

11  as compared to just taking a second to smell a

12  little longer?

13          A.   It depends.

14          Q.   And there's no duration that you're

15  looking for, so that lockup could be a quarter

16  second long and that would be enough to tell you

17  that he has alerted to the odor of narcotics at a

18  certain location?

19          A.   It's a little bit longer than a

20  quarter of a second.

21          Q.   How long would you say it is?

22          A.   I mean, I don't put a stopwatch on so

23  I don't know.

24          Q.   I mean, it's more than a quarter

25  second, right?

1        A.   Yes.

2        Q.   Is it more than one second?

3        A.   It's the totality of the situation.

4   But yeah.  So around a second, two seconds.  Depends

5   on the totality of the situation.

6        Q.   Okay.  How would the circumstances

7   change whether or not it would be, you know, one

8   second or two seconds or some other time?

9        A.   The changes of behavior that were

10  displayed prior to the alert.

11       Q.   So, essentially, if any of those

12  changes in behavior that you mentioned before were

13  also present prior to him giving a focused alert,

14  his focused alert, that would tell you -- you

15  wouldn't wait around necessarily as long, right?

16       A.   Correct.

17       Q.   All right.  Even with those other

18  behaviors, would you expect him to hold it for at

19  least a second?

20       A.   He'll hold it for as long as I tell

21  him to.

22       Q.   And, essentially, that's just until

23  you say, okay, good boy?

24       A.   Until he's released, yeah.

25       Q.   When you're using the K-9 to search a

1    car for narcotics, just as a general rule of thumb,

2    I guess, to run a dog around twice --

3              A.    I run my dog around three times.

4              Q.    Three times.  And then I've seen some

5    stuff about -- some people call, like, the first

6    time that they run around would be a scan, the

7    second time would be a detail.  Do you use that same

8    terminology?

9              A.    Correct.

10             Q.    And so for the third time around,

11   that would also be just a second detail?

12             A.    Correct.

13             Q.    Okay.  What's the difference between

14   a scan and a detail?

15             A.    A scan is he is checking the area on

16   his own as we walk around the vehicle, and a detail

17   is I give him direction to search the productive

18   areas of a vehicle.

19             Q.    And so a detail would be something

20   like going around and kind of saying, you know,

21   check here, check here, pointing to different parts

22   of the vehicle?

23             A.    I point to the productive areas of

24   the vehicle, yes.

25             Q.    In your experience, what are the

1   productive parts of the vehicle?

2          A.   Anyplace the odor can escape from, so

3   wheel well, engine compartment, door seams, windows,

4   trunk seams.  I mean, there's all kinds of places.

5          Q.   During that first runaround, the

6   scan, what specifically are you looking for -- or

7   are you looking for anything from Zino as you go

8   around that first time?

9          A.   Change in behavior or positive

10  indication.

11         Q.   If there is a change of behavior or

12  positive indication during the first runaround, do

13  you do a second detail?

14         A.   Nope.

15         Q.   Is a change of behavior considered to

16  be essentially a hit on a car, to say that he

17  believes that he's detected the odor of narcotics in

18  the vehicle?

19         A.   An articulable change of behavior

20  that's displayed during training can be considered a

21  positive indication.

22         Q.   And so that by itself, just the

23  change of behavior by itself, could be enough to say

24  that he has indicated that this area searched has

25  the odor of narcotics about it?

1          A.    It could, yes.

2          Q.    And then when you're saying it could,

3    I'm assuming there are times where just the change

4    of behavior by itself wouldn't be him telling you

5    that there's an odor of narcotics in a certain area,

6    right?

7          A.    It means that I may not accept just

8    one change in behavior.

9          Q.    What's the reason that you would not

10   just accept the one change of behavior?  I guess,

11   what's the point where you would go from saying that

12   this change of behavior would be sufficient to

13   establish that he's detected the odor of narcotics

14   on a vehicle?

15         A.    Because I want to be positive that he

16   is giving me a positive indication.  So just jumping

17   up in the window doesn't actually mean that it's the

18   only change of behavior I'm looking for.

19         Q.    Do you have any specific commands you

20   use to tell Zino to search a specific -- I guess,

21   what commands would you use during a typical vehicle

22   search using Zino?

23         A.    Any time I use Zino to detect

24   narcotics, I use the command "kill dope."

25         Q.    And I'm assuming that's not an

1    acronym, it's literally just the command that you

2    use to say search this area?

3              A.   Correct.

4              Q.   What other commands would you use --

5    any other commands that you would use during a

6    search, using Zino, for a vehicle?

7              A.   Check.

8              Q.   Check?

9              A.   Check.  Check here.

10             Q.   And then you would use, okay, good

11   boy, to say you're done, right?

12             A.   To release him, yes.

13             Q.   To release, that's it.  As a part of

14   Zino's training, do you also conduct obedience

15   training?

16             A.   I do.

17             Q.   Is that in addition to the six hours

18   or is that included in the six hours a week?

19             A.   It's included.

20             Q.   Is it common for Zino to show either

21   a -- well, I guess, I'll break this down into two.

22             Is it common for Zino to show a

23   change in behavior during a search but then to not

24   find any drugs in the search that came afterwards?

25             A.   A dog alerts to the odor of

1    narcotics, so he's alerting to the odor of

2    narcotics.

3           Q.    Okay.  So I'll change that.  So alert

4    to the odor of narcotics.  Is it common for Zino to

5    alert to the odor of narcotics during a search but

6    then after the resulting search to come up without

7    finding any drugs?

8           A.    During training?  No.

9           Q.    How about in real life?

10          A.    Just because I don't find drugs

11   doesn't mean there's not drugs there, and it doesn't

12   mean the odor is not there, so he's alerting to the

13   odor.

14          Q.    Right.  And so my question still is:

15   Is it common for him to alert to the odor but then

16   not to find drugs during the search?

17          A.    There are times that we alert to the

18   odor of narcotics and do not find narcotics, yes.

19          Q.    And so is it -- part of the question,

20   though, is, would you say it's common or would you

21   say that it's uncommon that that happens?

22          A.    Uncommon.

23          Q.    You were involved in Zino's training

24   when he was first brought into the police

25   department, right?

1          A.    That's correct.

2          Q.    Kind of the way I understand it is

3    the thing that actually gets them to start, you

4    know, actually looking for drugs, it's kind of like

5    you give them a reward, there's a toy that they want

6    that they get if they do a good job, whether they

7    notify or not.  Is there any sort of reward that's

8    given to Zino after he conducts a search?

9          A.    He has a simulated prey item.

10          Q.    And that's still given to him after a

11    search?

12          A.    During training.

13          Q.    Is it during training only?

14          A.    Yes.

15          Q.    Okay.  So when he's out in the field

16    there's just no reward, he just goes back into the

17    cruiser?

18          A.    Correct.

19          (WHEREUPON, Plaintiff's Exhibit No.

20    2 was marked for identification.)

21          Q.    Okay.  And just for the record,

22    Exhibit 2 is CPD1421 to 1423.  The K-9 unit prior to

23    Zino was Coen; is that right?

24          A.    That's correct.

25          Q.    Okay.  And so this, to me, looks like

1   it's a certification for -- well, I guess, testing

2   and certification for Coen for 2016, I guess, right

3   around the time that he was retired, right?

4           A.   That's correct.

5           Q.   And then looking at the front page,

6   it says list each, accelerant, explosive, narcotic,

7   wildlife odor passed.  And for Coen, at least, it

8   was listed as marijuana, cocaine, heroin, and

9   methamphetamine.  That's what Coen was certified on?

10          A.   Correct.  And any derivative thereof.

11          Q.   And then on the last page, it's just

12  a certification from NAPWDA certifying that --

13  basically it's a certification for you and Coen for

14  narcotic detection for those substances, right?

15          A.   Correct.

16          Q.   Okay.

17          (WHEREUPON, Plaintiff's Exhibit No.

18  3 was marked for identification.)

19          Q.   Exhibit 3, for the record, is just --

20  it's a memo, and it's some more NAPWDA information.

21  It's CPD1424 to CPD1429.  So it looks like on the

22  first page Coen was retired on September 18, 2016;

23  is that right?

24          A.   Correct.

25          Q.   And then 1425 is a team certification

1    test for Zino from December 22, 2016; is that right?

2              A.   Correct.

3              Q.   Okay.  And so just comparing it with

4    No. 2, I mean, I notice down here it doesn't list

5    the accelerant, explosive, narcotic, wildlife odor

6    passed for the test.  Kind of looking at it, you

7    know, if you go back to the last page, it looks like

8    maybe this is a certification for pretty much

9    everything besides the narcotic portion, if you look

10   at the certification.

11             A.   Correct.

12             Q.   Okay.

13             A.   That's the patrol aspect of it.

14             Q.   Okay.  So it looks like Zino was

15   certified for the patrol portion of the K-9 -- well,

16   I guess I should say you and Zino were certified for

17   patrol in December of 2016.

18                  I've looked through the records that

19   we got from Covington, I didn't actually see any

20   certifications for Zino in regards to the narcotic

21   portion; do you know --

22             A.   On that date?

23             Q.   For any time from -- the only

24   certification that I have for him is on CPD1429.

25             A.   No, he's got yearly certifications.

1    Q.   So looking at 1429, that's the actual

2    certification, it's the last page of that exhibit.

3    So are you saying that he would have -- you and Zino

4    would have certifications for each year that look

5    similar to this, but would also list the narcotics?

6         A.   Correct.

7         Q.   Okay.

8         A.   Zino did not become certified in

9    narcotics until 2017.

10        Q.   That's all I have for those.  You can

11   set them aside.

12        (WHEREUPON, Plaintiff's Exhibit No.

13   4 was marked for identification.)

14        Q.   So Exhibit 4, just for the record,

15   these are some of the training records for Zino from

16   March 2017 and prior.  And then, just for the

17   record, I'll read all of these out.  It's CPD1340,

18   1334, 1310, 1307, 1301, 1299, and 1296.

19             So just taking the first page real

20   quick, these are training reports that are prepared

21   by you, or whoever the trainer is, regarding Zino's

22   weekly training, right?

23        A.   These are prepared by me.

24        Q.   How long do these trainings normally

25   take?

1          A.    How long do these trainings normally

2    take?

3          Q.    Yes.

4          A.    Searches can be anything from three

5    minutes to 20 to 25 minutes.

6          Q.    And so in addition to this, there

7    would be -- I mean, to get the six hours, you would

8    also have -- I'm assuming part of that would include

9    obedience training?

10          A.    Our hours of six training includes

11    narcotics and patrol training, that's correct.

12          Q.    If you turn to the second page, which

13    is CPD1334, this looks like it's a record of a

14    training that you would have performed on March 1st,

15    2017; is that right?

16          A.    Correct.

17          Q.    And I believe that Zino would have

18    been certified, the first time for narcotics,

19    sometime in March of 2017; does that sound right?

20          A.    I don't have the exact date in front

21    of me so I don't know.

22          Q.    Okay.  During these trainings, are

23    these -- I'm assuming that the hides, the actual

24    placement of the substances is done by you or

25    whoever the trainer is at that time?

1          A.   It's done by multiple handlers, yes.

2          Q.   Okay.  And so even at this March 1,

3    2017 training, would there have been multiple other

4    handlers there training at the same time?

5          A.   Yes, more than likely.  I don't have

6    the rest of my records with me to tell you who was

7    there.

8          Q.   So there would be other records that

9    would indicate other people involved in the training

10   at that time?

11         A.   Should be.  It should be with the

12   obedience portion and the patrol portion of it.

13         Q.   If you could turn to the third page,

14   which is CPD1310, the training from January 27,

15   2017, it looks like for this one it was Trainer Doug

16   Eldridge.  Have you see this -- I guess, Doug was

17   one of the ones who was involved in initially

18   training Zino; is that right?

19         A.   Doug was the initial trainer, that's

20   correct.

21         Q.   Okay.  So reading his comments, it

22   looks like it was trying to -- part of the work that

23   they were working on was to have Zino put his nose

24   where he presents, and then we won't continue on

25   until he places his nose there.

```
 1              A.   This is my comments.

 2              Q.   Huh?

 3              A.   This is my comments.

 4              Q.   Oh, okay.  So for this here, you were

 5    actually putting -- so for training Zino at this

 6    point, in 2017, part of the training involved you

 7    putting his nose where you told him to, and then you

 8    not moving until he actually did what he was

 9    supposed to, put his nose wherever you were telling

10    him to, right?

11              A.   Correct.

12              Q.   Okay.  And what was the reason during

13    this training of placing his nose at the location

14    and not continuing on until -- or trying to get him

15    to place his nose on location before moving on to

16    the next spot?

17              A.   Because if I tell him to check here,

18    he has to check here before I move on.

19              Q.   Okay.

20              A.   Okay.  It goes back to the productive

21    area of a vehicle.

22              Q.   And specifically, though, it's also

23    about him -- he's actually following your hand and

24    placing his nose where you present, right?  So he's

25    actually putting his nose on whatever you're telling
```

1    him to?

2            A.   He's putting his nose where I

3    pointed.  He doesn't have to put his nose on it.

4            Q.   Okay.  So placing his nose where I

5    present, to you that means that he was pointing his

6    nose in the direction of whatever thing you were

7    pointing to?

8            A.   If I point to the seam of the door,

9    he puts his nose at the seam of the door.  He

10   doesn't have to touch it.

11           Q.   And then the last sentence says, We

12   also worked on him staying at source longer before

13   receiving his reward.  I guess, what were you

14   working with him there for?  What was the reason for

15   keeping his nose at the source longer before he

16   received his reward?

17           A.   It's just part of the positive

18   indication process, so he holds that until he's

19   released.

20           Q.   If you'd go to the next page, which

21   is CPD1307.  Once again, the trainer's listed as

22   Doug Eldridge for January 24, 2017.  And this one

23   looks like you're still working with him placing his

24   nose, but then at this point, you were basically

25   helping train him to stay at the source even if you

1    left his side, right?

2            A.    Correct.

3            Q.    And that -- I'm assuming that that,

4    again, would be something else that would lead to

5    the same thing you were talking about before,

6    showing a positive indication?

7            A.    Correct.

8            Q.    If you go to -- it's a couple pages

9    after that, it's CPD1299.  Training -- this would be

10   for January 10, 2017.  It looks like down in the

11   comments, during this training, a part of it would

12   be that he would show change of behavior, but then

13   you would actually have to give him a command so he

14   would show a final alert.  And I'm assuming that

15   that just has to do with, once again, trying to get

16   the behavior out to give a solid indication of a

17   positive -- or get a solid positive indication from

18   him?

19           A.    What was your question again?  I'm

20   sorry, sir.

21           Q.    Yeah, I'm just asking about the part

22   that says, "Give him a command."  Basically, you

23   would encourage him to follow odor to the source and

24   then give him a command so that he would show a

25   final alert.

1              And I'm assuming that that final

2     alert is so that it's kind of just training him to

3     actually give a strong positive indication whenever

4     he senses the odor of narcotics, right?

5              A.   The final alert is -- this is very

6     early on in his training, so he has to be taught

7     what the response is.  And that's what that's about.

8     That's what the command is for.

9              Q.   Sure.  And so what is the final alert

10    that you were training him for at that point; what

11    was the final alert?

12             A.   With it being this early on in

13    training, I don't remember if we started off trying

14    to get him to sit, or if we were using the focused,

15    so to stay and lock up.  I think we were doing -- I

16    don't know which it was at that time.

17             Q.   Okay.  But it would have been one of

18    those two, right?

19             A.   Correct.

20             Q.   And then for this, some of these

21    other narcotics training records have a list of, you

22    know, where certain items are placed and what they

23    are.  The four odors that are listed in the

24    comments, were those actual substances, so the

25    marijuana, meth, heroin and the other one that he's

1    trained in, or was it just some sort of odor bag?

2              You can train them on two different

3    things.  You can train them on the actual

4    substances, to smell the actual substances, and they

5    do make --

6              A.    Psuedo.

7              Q.    Psuedo smells or psuedo substances to

8    use.  Were these actual substances or were they the

9    psuedo?

10             A.    These were actual substances.

11             Q.    Okay.  And if you go to CPD1296.

12             A.    I'm sorry, which one, sir?

13             Q.    The last one.  It's CPD1296.  Once

14   again, this is another training record from January

15   of 2017, just that last sentence, PSD Zino completed

16   the searches and did a good job of alerting and

17   holding the stare until he was released to get his

18   reward.

19             So I've heard about, you know, the

20   different signs of positive indications.  Is the

21   stare a part of that or is it a different positive

22   indication?

23             A.    The stare is part of the staying

24   rigid.

25             (WHEREUPON, Plaintiff's Exhibit No.

1    5 was marked for identification.)

2              Q.    So Exhibit 5 is just a collection of

3    some of your K-9 reports with Zino out in the field.

4    And just for the record, it is CPD1079, 1081, 1083,

5    1085, and 1244.  So any time that you use Zino in

6    the course of, you know, patrol, doing a search,

7    anything like that, you're supposed to fill out one

8    of these K-9 reports?

9              A.    Any time we use him for narcotic

10   purposes.

11             Q.    Okay.  So just looking at the

12   narrative on CPD1079, so going just to the second

13   sentence.  "K-9 Zino gave a positive alert on the

14   vehicle."  When you're saying alert here, that's

15   your -- do you mean that it was just him giving the

16   change of behavior, or does that mean that that's an

17   actual positive indication for --

18             A.    It's all inclusive.

19             Q.    So then this example, While

20   performing the first detail of the vehicle, PSD Zino

21   jumped up to examine the driver window and then

22   proceeded to the rear passenger door on the driver's

23   side and his body became rigid at the window giving

24   a positive indication.

25                   So, specifically, while performing

1    the first detail, does that refer to the first pass

2    around or would that refer to the second pass

3    around?

4              A.    The first one is a scan, and then the

5    second one is a detail, and the third one is a

6    detail.  So it would be the second one.

7              Q.    Okay.  And then just looking at the

8    last sentence of the first paragraph in the

9    narrative, it looks like you're -- at least as of

10   this date, June 22, 2019, you had a certification

11   through NAPWDA that started on September 14, 2018;

12   does that sound correct?

13             A.    That was the last time he was

14   certified, that's correct, prior to that date.

15             Q.    Right.  Thank you.

16                   Then on the next one, which is

17   CPD1081, it looks like the alert in this case, the

18   positive indication was his body was rigid in a

19   seated position.  So as far as the actual positive

20   indication goes, it doesn't matter what position his

21   body is in as long as he becomes rigid as a part of

22   it, right?

23             A.    Correct.

24             Q.    Sorry.  Some of my questions have

25   already been answered so I'm trying to not go

1    through and ask the same questions again.

2            A.   You're fine.

3            Q.   If you go to the next page, it should

4    be CPD1085.

5            A.   The next that I have is 83.

6            Q.   Okay.  Go to the next one then.

7    Let's skip that one.

8            A.   Okay.

9            Q.   Just looking, again, at the positive

10   indication in this case, he stood on his hind legs

11   with his head in the driver's window with his mouth

12   closed and body rigid.  And I can't remember if you

13   talked about this already, but is having the mouth

14   closed, is that a part of the positive indication,

15   or is that a part of his change in behavior?

16           A.   Part of the change in behavior.

17           Q.   Okay.

18           A.   And I discussed that.

19           Q.   And then if you go to the last page,

20   which is CPD1244, so this is the K-9 Deployment

21   Report for the stop with Mr. Cundiff.  So while

22   performing the first detail of the vehicle, PSD Zino

23   jumped up to the driver's window and then headed

24   towards the rear of the vehicle.  He stopped and

25   returned to the rear seam of the driver's side rear

1    passenger door seam and his body became rigid with

2    his nose on the vehicle.

3                    So just taking that kind of in steps.

4    So the first detail, once again, that would be the

5    first time -- the second time that he went around

6    the car, right?

7                    A.    Correct.

8                    Q.    Okay.  So the actual focused alert

9    that he gave would have been his body became rigid

10   with his nose on the vehicle on that rear door seam,

11   right?

12                   A.    Correct.

13                   Q.    And then you're attributing the

14   jumping up at the driver's window as being a part of

15   change of behavior?

16                   A.    Part of it.

17                   Q.    Okay.  And then I'm assuming that the

18   other part of the change of behavior would be he

19   headed towards the rear of the vehicle, so he kind

20   of went past that rear door seam and then returned

21   to it?

22                   A.    He went past it, stopped, turned

23   around and came back to it.

24                   Q.    Okay.  So that's another change in

25   behavior that you look for with Zino?

1          A.   Correct.

2          Q.   Are there any other changes of

3 behavior in that sentence or anywhere else in this

4 that, you know, would be a part of that two-step

5 process?

6          A.   Well, the body becoming rigid and his

7 nose touching the vehicle is also a change in

8 behavior.

9          Q.   But that's part of his changed

10 behavior, the change thing that gives you the

11 focused alert, that's your positive indication?

12          A.   Correct, but it's also a change in

13 behavior.

14          Q.   Okay.  In viewing your -- so looking

15 at just the small sentence down below, about what

16 was found, it looks like there was an unrecoverable

17 amount of marijuana that was found?

18          A.   Correct.

19          Q.   Okay.  And then in the videos that

20 you reviewed, do you recall you, you know, saying

21 that you found a marijuana seed, a single marijuana

22 seed during the search?

23          A.   I don't remember.

24          Q.   And so that also means you wouldn't

25 have any memory about where that marijuana seed

1   would have been found?

2          A.   I found -- I couldn't tell you if the

3   marijuana seed I found was in the purse or not.  But

4   I found the uncollectible remains of marijuana in

5   the purse.

6          Q.   And then just, you know, going

7   through it, I think there was an officer whose first

8   name was Denny; do you know what his --

9          A.   That's his last name.

10          Q.   Okay.  That makes it easier.  What's

11   Officer Denny's first name?

12          A.   Josh.

13          Q.   And is Denny D-E-N-N-Y?

14          A.   Correct.

15          Q.   I can play it if you want, but with

16   the video it looked like you had Officer Denny

17   search the purse and he was the one who located the

18   marijuana shake inside the purse.  Do you recall

19   reviewing the marijuana shake?

20          A.   I don't recall.

21          Q.   And then neither the shake nor the

22   marijuana seed were collected in any manner, right?

23          A.   Not by me.

24          Q.   In those situations where, you know,

25   shake or small amounts of drugs are found during a

1   search, is it normal to just leave that in the

2   vehicle or wherever you found it?

3           A.   It's uncollectible.

4           Q.   Well, okay.  Let's start with the

5   marijuana seed.  Is it illegal to possess marijuana

6   seeds in the state of Kentucky?

7           A.   It's possession of marijuana so it's

8   part of marijuana, so yes.

9           Q.   Okay.  And so a marijuana seed is

10  obviously something you can take, it's not just a --

11  you know, such a tiny amount that you couldn't grab

12  it.  In that circumstance where you find somebody

13  with a collectible amount of illegal substance,

14  would it be normal to leave that in the vehicle

15  where you searched?

16          A.   Have I left marijuana seeds before?

17  Yes.

18          Q.   Okay.  Is it a part of policy to

19  leave it?

20          A.   I don't know if it gets as specific

21  as a marijuana seed, so --

22          Q.   But as far as you go from your time

23  searching the vehicle, you didn't collect a

24  marijuana seed, right?

25          A.   No.

44

1          Q.   And you didn't try to collect any of

2     the shake that was in Ms. Sprague's purse, right?

3          A.   No.

4          Q.   In a situation where, you know, you

5     find somebody possessing an illicit substance, even

6     if you aren't going to charge them with it, is it

7     normal practice to collect it so it can be destroyed

8     or is it just up to the officer?

9          A.   It depends how much of the substance

10    is collected.

11         Q.   Okay.  So what's the -- what's kind

12    of the minimum amount?

13         A.   I mean, I'm not going to collect a

14    seed.

15         Q.   As far as body cam and dash cam goes

16    for Covington Police Department, just kind of

17    looking through this and some other cases, it looks

18    like the body camera and dash cam are hooked up

19    together to some extent, so if you turn on your

20    lights for a stop, it will turn on your body cam and

21    also turn on the dash cam?

22         A.   I don't know about the dash cam, sir.

23         Q.   What about the body cam?

24         A.   If you activate your emergency

25    equipment, your body cam should come on, yes.

1          Q.   In June of 2020, did the cruiser that
2   you had, did it have a dash cam on it?
3          A.   No.
4          (WHEREUPON, Plaintiff's Exhibit No.
5   6 was marked for identification.)
6          Q.   This is a pretty simple one.  So this
7   is, for the record, CPD1075, which has been marked
8   as Exhibit 6.  This is another K-9 Deployment Report
9   that you completed.  Do you recall completing this?
10  Let's start with that.
11         A.   I completed this, yes.
12         Q.   Okay.  Looking at the date of the
13  report at the top, it's dated for June 8, 2019?
14         A.   Uh-huh.
15         Q.   Okay.  So that's the date that this
16  stop would have happened?
17         A.   Correct.
18         Q.   Okay.  Just going down to the first
19  paragraph, in the narrative, just the very last
20  line, it looks like listed here you have your
21  current narcotic certification through NAPWDA began
22  on September 11, 2019?
23         A.   Yeah.  It was a clerical error.
24         Q.   Okay.  Does that mean that this
25  report was completed after your certification in

1    September of 2019 then?

2              A.    I don't know when I completed the

3    report.

4              Q.    But, I mean, would you have known

5    when you would have completed your certification

6    through NAPWDA -- sorry.  I guess, how would you

7    know when you would have completed your

8    certification through NAPWDA, I guess, prior to that

9    date?  How would you know that on June 8th that you

10   were going to complete your certification on

11   September 11th?

12             A.    I know when we do the training.  But,

13   like I said, I don't know when I completed this

14   report so I couldn't tell you if I completed it

15   before or after that date.

16             Q.    Okay.  Is it fair to say that

17   sometimes you don't get to all the reports you need

18   to get to?  I mean, it might take you some time to

19   fill it out?

20             A.    Yes, sir, at times it might.

21             Q.    So just a possibility that for this

22   one it doesn't get completed until after your

23   certification in 2019?

24             A.    Correct.

25             Q.    Okay.  Let me check through these and

1   see if I need anything from here.  You can go back

2   to it if you want, I'm just going to ask you some

3   questions about Exhibit 3, which is part of the

4   information that related to Zino's certification.

5   If you'd go to that second page, which is 1425.  Who

6   is Glenn Jackson?

7           A.   Glenn Jackson is a master trainer for

8   North American Police Working Dogs Association.

9           Q.   Did he also do some, I guess,

10  training with Zino?  Did he help in training Zino?

11          A.   He's helped train Zino before,

12  correct.

13          Q.   Okay.  When this test was being done

14  for the December of 2016, do you recall where that

15  took place, the NAPWDA K-9 Team Certification Test?

16          A.   I do not.

17          Q.   Are you able to say if it was local

18  or out of state?

19          A.   It's either going to be here or in

20  Indiana, but I don't remember where it was at.

21          Q.   That's all I've got for that.

22               I'm going to show you part of this

23  video.  Might take a five-minute break or something.

24  And then I'll show you part of the video, it'll only

25  take five or 10 minutes, and then I'm done.

1          MR. MANDO:  All right.  Good.

2              (WHEREUPON, Plaintiff's Exhibit No.

3   7 was marked for identification.)

4              (WHEREUPON, Plaintiff's Exhibit No.

5   8 was marked for identification.)

6              (A brief recess was taken.)

7   BY MR. ROACH:

8          Q.   Just for the record, this will be

9   from Plaintiff's Exhibit 8, and it's file name

10  Extraction 1.1_TS.MP4.  So this will be some video

11  footage from Officer Ullrich's dash cam.  For the

12  record this is starting at 7:39 into the video,

13  timestamp of 6:20:06.  So this will just be you

14  doing your search with Zino.

15         A.   Okay.

16              (Video playing.)

17         Q.   Just to stop real quick.  This is at

18  8:13 on the video, timestamp 6:20:40.  So that was

19  just you doing the first scan of the car, right?

20         A.   Correct.

21         Q.   Okay.  Was there anything there that

22  you noticed as far as change of behavior or alerts

23  that Zino did on the car?

24         A.   The change of behavior at the rear

25  seam -- rear seam rear passenger door.

1          Q.    Start again from the same spot.

2                (Video playing.)

3          Q.    Again, stopping at timestamp 6:20:46.

4    So at this point, Zino is up on the driver's side

5    door, that was one of the other change of behaviors

6    that you noted in your deployment report, right?

7          A.    Correct, because I didn't present

8    that.

9          Q.    Okay.  The time that he was up on the

10   door, was he exhibiting the focused alert?

11         A.    He was -- I'm not 100 percent sure he

12   was rigid at the time because I didn't watch that

13   portion of it.  I mean, it's a change of behavior

14   that I call it.  I didn't call that as his alert.

15   It was part of the change of behavior, is what I was

16   looking at it as, and I continued on.

17         Q.    Start from the same spot, 6:20:46.

18                (Video playing.)

19         Q.    Okay.  Go back a couple seconds.

20   Okay.  So at 6:20:47, you can kind of see you

21   pointing near that rear seam on the driver's side

22   door.  That's just a part of your detailing?

23         A.    Correct.

24         Q.    Standard procedure to kind of point

25   to different areas where --

```
 1              A.    The productive areas of the vehicle,

 2   yes.

 3                    (Video playing.)

 4              Q.    Okay.  And then, at this point it

 5   looks like Zino is at that seam?

 6              A.    Correct.

 7              Q.    Okay.  And it's 6:20:48.

 8                    (Video playing.)

 9              Q.    Okay.  And then, at that 6:20:51,

10   he's showing his focused alert and the search is

11   pretty much over, right?

12              A.    Correct.

13              Q.    After you get a positive indication,

14   that focused alert, is that the end of the search

15   normally?

16              A.    Yes.  That's the end of his portion

17   of the search.

18              Q.    Right.

19                    Okay.  This will be a part of

20   Exhibit 7.  Just for the record, it is file name

21   Extraction 1.1_TS-3.  Okay.  So this is starting at

22   3:10 into the video, timestamp 6:20:13.

23                    (Video playing.)

24              Q.    Stop right there real quick.  So is

25   that you saying "let's kill dope"?
```

1    A. Uh-huh.

2    Q. Okay.  Let me go back a couple

3 seconds.  So starting at timestamp 6:20:51, so you

4 tell him to check that rear seam again, right?

5    A. Correct.

6    Q. That's part of your detailing,

7 completely normal?

8    A. It's part of my normal detail

9 process, yes.

10     (Video playing.)

11    Q. Okay.  So right there, that point

12 where he kind of just went past and turned back

13 around, that was his change of behavior to move back

14 towards the seam?

15    A. Uh-huh.

16    MR. MANDO:  You have to answer yes or

17 no, Mark.

18    A. I'm sorry.  Yes.

19    MR. ROACH:  Thanks, Jeff.

20 BY MR. ROACH:

21    Q. And then that right there, that was

22 his focused alert?

23    A. The totality of the whole situation

24 was his alert, the articulable changes in behavior

25 and then that, correct.

52

1              Q.   So everything that we just saw from

2    the beginning of that video to the 6:20:55 mark

3    would be -- would include all the changes of

4    behavior that he exhibited, as well as the focused

5    alert?

6              A.   Correct.

7              Q.   Okay.

8              MR. ROACH:  That's all I have for

9    you.

10             THE WITNESS:  Okay.

11             MR. MANDO:  We have no questions,

12   Kelly, but I'll take signature on that through my

13   office, please.

14

15

16

17             _____

18                  MARK RICHARDSON

19

20

21

22        (DEPOSITION CONCLUDED AT 10:30 A.M.)

23

24

25

```
 1              C E R T I F I C A T E

 2   COMMONWEALTH OF KENTUCKY:
     COUNTY OF KENTON         :
 3

 4          I, Kelly A. Brabender, the undersigned, a

 5   duly qualified notary public within and for the

 6   Commonwealth of Kentucky, do hereby certify that

 7   MARK RICHARDSON was by me first duly sworn to depose

 8   the truth, the whole truth, and nothing but the

 9   truth; that the foregoing is the deposition given at

10   said time and place by said witness; that said

11   deposition was taken pursuant to stipulations

12   hereinbefore set forth; that said deposition was

13   taken by me in stenotypy and transcribed by means of

14   computer under my supervision; that the transcribed

15   deposition was submitted to the witness for

16   examination and signature and that signature may be

17   affixed out of the presence of the Court Reporter;

18   that I am neither a relative of any of the parties

19   or any of their counsel and have no interest in the

20   result of this action.

21          IN WITNESS WHEREOF, I have hereunto set my

22   hand and official seal of office at Covington,

23   Kentucky, this 30th day of August, 2022.

24          _____/s/Kelly A. Brabender_____

25          Kelly A. Brabender-Notary Public #KYNP12186
            My commission expires:  September 28, 2024
```