UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
EASTERN DIVISION AT COVINGTON
CASE NO. 2:21-CV-00072

| | | |
|---|---|---|
| **JEFFREY CUNDIFF** | ) | **PLAINTIFF** |
| | ) | |
| | ) | |
| **V.** | ) | |
| | ) | |
| **DOUGLAS ULLRICH, et al.,** | ) | **DEFENDANTS** |

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Comes Plaintiff, Jeffrey Cundiff through counsel, and for his Response to Defendant's Motion for Summary Judgment (R. 28, PageID# 83-99), states as follows:

**INTRODUCTION**

On June 8, 2020, Defendant Ullrich pulled over Plaintiff for running a stop sign. Through the course of the traffic stop, Defendant Ullrich escalated the stop to include a partial strip search and body cavity search of Plaintiff. The basis for the "probable cause" to perform the search was an "unrecoverable" amount of marijuana shake and a single marijuana seed found in Plaintiff's passenger's purse. Plaintiff testified that Defendant penetrated Plaintiff's rectum during the course of the body cavity search, while Defendant Ullrich denies penetrating or touching Plaintiff's rectum. Despite Defendant's arguments, the totality of the circumstances creates a genuine issue as to a material fact; thus, a trial is necessary to resolve this factual dispute.

Defendant Ullrich testified that he performed a search for contraband on Plaintiff's person after the location of the shake and single seed. Defendant Ullrich reached his gloved hands under Plaintiff's underwear and used the back of his straight hand to search Plaintiff's butt-crack from

top to bottom.  (R. 30, Ullrich Depo., Page ID# 146-150).  Defendant Ullrich also testified that he then reached around the front of Plaintiff and ran his hand under Plaintiff's underwear, along the seam between Plaintiff's leg and groin, searched behind Plaintiff's penis and scrotum, and back up the seam of the other leg.  Id.  There is no doubt that in the course of this search, Defendant Ullrich moved Plaintiff's penis and scrotum to check behind them.  (R. 30, Page ID#148).

After finding no evidence of contraband on Plaintiff, Defendant Ullrich stated, "he won the game of 'I want it more.'  It's far enough in him that I can't find it."  (R. 30, Page ID# 149).  Defendant Ullrich then completed his citation against Plaintiff for running a stop sign and released him from custody.  Plaintiff spent roughly thirty minutes in handcuffs while multiple officers searched the scene for contraband in Plaintiff's possession.  Ultimately, Defendant found nothing significant to arrest him for the initial traffic violation.

## I.   COUNTER STATEMENT OF FACTS

On July 8, 2020, just after 2:00 a.m., Defendant Ullrich initiated a traffic stop of Plaintiff for running a stop sign.  (R. 28-2, Uniform Citation, Page ID# 101).  Plaintiff pulled directly over as soon as he was out of the way of traffic and felt it was safe to stop.  (R. 31, Cundiff Depo., Page ID# 175).  Defendant claims he observed Plaintiff, prior to Plaintiff stopping his vehicle, reaching around, lifting himself off the seat, reaching towards the passenger and his own rear end, and made a sudden movement towards his waistband as he exited the car.  (R. 30, Page ID# 135).  But, Plaintiff's passenger testified that she never witnessed any such movements occurring.  (Sprague Depo., Pages 15, 28-29).  Defendant exited his cruiser, walked to the passenger side of Plaintiff's vehicle, and instructed Plaintiff to roll the car's windows down and turn the car off.  (R. 28-5, Ullrich Body Worn Camera Video, Conventionally Filed, at 6:13:41 to 6:13:51; R. 28-5, Ullrich Body Worn Camera Video, Conventionally Filed, at 6:13:23 to 6:13:58).

2

During this initial exchange, Plaintiff made a comment to Defendant Ullrich saying, "you don't gotta be a dick-sucker, man," to which Defendant replied, "I'm trying not to be a dick-sucker." (R. 28-5, at 6:18:01 to 6:18:06). During the course of the stop, Defendant asked Plaintiff's passenger, Sprague, to step out of the vehicle. (R. 28-5, at 6:16:15 to 6:16:28). Defendant then asked Plaintiff to step out of the vehicle, cuffed him, and patted him down. (R. 28-5, at 6:18:10 to 6:19:18). Plaintiff stated, "I'm on the same team as you guys," to which Defendant responded, "Well, I'm a dick-sucker so you're probably not on my team." (R. 28-5, at 6:18:38 to 6:18:44).

During this time, Officer Mark Richardson arrived and performed a search using his dog aka drug detection canine aka K9. (R. 32, Richardson Depo., Page ID# 250). Officer Richardson interpreted his K9's actions as having alerted to the presence of narcotics. (R. 32, Page ID# 241-243). Allegedly, either marijuana shake, or a marijuana seed, or both, were found by Officer Richardson and Officer Denny, but not preserved as evidence, although Defendant Ullrich never saw either. (R. 30, Page ID#140-141). Defendant then began a second search of Plaintiff. (R. 31, Page ID# 181). Defendant told Plaintiff to spread his feet apart so that if anything was concealed between his thighs, it would fall to the ground. (R. 30, Page ID# 144). During the search, Plaintiff's butt cheeks were clearly visible on the body worn camera. (R. 28-5, at 6:41:26). Defendant initially searched Plaintiff underneath his shorts but over his underwear. (R. 31, Page ID# 181).

Defendant insisted that Plaintiff was "squeezing his ass cheeks together like [he] was hiding something." (R. 28-5, at 6:41:26 to 6:41:50). However, Plaintiff's act of allegedly hiding drugs was a natural reaction to somebody trying to put their hand in such an intimate place. (R. 31, Page ID# 182). Plaintiff insisted that he was not hiding anything inside of himself. (R. 28-5, at 6:42:30). Officer Ullrich continued the search under Plaintiff's underwear on his back side. (R.

3

30, Page ID# 146). Officer Ullrich also searched the front side of Plaintiff underneath his underwear. (R. 30, Page ID# 148). Defendant Ullrich reached his gloved hand under Plaintiff's underwear and used the back of his straight hand to search Plaintiff's butt-crack from top to bottom. (R. 30, Page ID# 146-150). It was at this point when Plaintiff's rectum was penetrated by part of Officer Ullrich's finger. (R. 31, Page ID#183). Defendant Ullrich denies ever making contact with Plaintiff's rectum with his gloved hand but does not deny that he ran his hand down Plaintiff's butt-cheeks from top to bottom. (R. 30, Page ID# 146-47). During this search, Defendant was looking into Plaintiff's underwear while he was pulling Plaintiff's underwear out. (R. 30, Page ID# 147; R. 28-5, 6:41:26 to 6:42:18).

Defendant Ullrich also testified that he then reached around the front of Plaintiff and ran his hand under Plaintiff's underwear, along the seam between Plaintiff's leg and groin, searched behind Plaintiff's penis and scrotum, and back up the seam of the other leg. (R. 30, Page ID# 146-150). There is no doubt that in the course of this search, Defendant Ullrich moved Plaintiff's penis and scrotum to check behind them. (R. 30, Page ID#148). In Defendant's normal practice he goes along the seam between the leg and groin, moves the scrotum and penis out of the way to check underneath them, and comes up the other side. (R. 30, Page ID# 148). In performing the search behind the scrotum, Defendant Ullrich was manipulating the scrotum. (R. 30, Page ID# 149).

During the search, Defendant Ullrich asked Plaintiff, "What do you got hidden up inside of you?" to which Plaintiff replied, "I don't have nothing hidden inside of me." (R. 28-5, at 6:42:12 to 6:42:16). Plaintiff then inquired, "Isn't that what you said, inside of me?" to which Defendant Ullrich responded, "Yes, inside of you. Something shoved right up into your butt." (R. 28-5, at 6:42:18 to 6:42:23). Plaintiff stated there is nothing inside of him and even offered to go to a doctor or whatever Officer Ullrich needed him to do to prove that nothing was inside him. (R. 28-

4

5, at 6:42:24 to 6:42:30). After finding no evidence of contraband on Plaintiff, Defendant Ullrich stated, "he won the 'I want it more' game, cause it's far enough in him that I can't find it." (R. 30, Page ID# 149)(R. 28-5, at 6:43:18 to 6:43:22). Ultimately, Plaintiff was not arrested, but cited for running a stop sign. (R. 28-2, Page ID# 101).

## II. ARGUMENT

Government officials are immune from civil liability under 42 U.S.C. § 1983 when performing discretionary duties, provided "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a defendant is protected by qualified immunity, the Sixth Circuit has adopted a two-prong test. *Jones v. Sandusky County*, 541 Fed. Appx. 653, 660 (6th Cir 2013)(*citing Chappell*, 585 F.3d at 907). First, the Court must determine whether the facts alleged show the officer's conduct violated a constitutional right. *Id.* Second, the Court must determine whether that right was clearly established at the time of the violation. *Id.*

### III. DEFENDANT ULLRICH IS NOT ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S FOURTH AMENDMENT CLAIM WHERE HE LACKED PROBABLE CAUSE AND CONDUCTED THE SEARCH IN A CONSTITUTIONALLY IMPERMISSIBLE MANNER

Defendant Ullrich makes three arguments that he is entitled to summary judgment on Plaintiff's Fourth Amendment claim: 1) That he had probable cause to search Plaintiff for drugs, 2) that the search was carried out in a reasonable manner, and 3) that he is entitled to qualified immunity. However, when taken in a light most favorable to Plaintiff, the facts show that Defendant Ullrich lacked probable cause to search Plaintiff and that his search of Plaintiff's rectum on the street was based on nothing more than a hunch, and clearly unconstitutional. (See R. 33, Plaintiff's Motion for Partial Summary Judgment, Page ID# 256-263). Plaintiff incorporates by

5

reference all facts and arguments made in his Motion for Partial Summary Judgment into this Response.

### A. Defendant Ullrich Lacked Probable Cause to Believe that Plaintiff had Stowed Contraband in his Rectum

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause. U.S. Const. amend. IV. Searches that intrude into the body implicate greater constitutional concerns. *See Schmerber v. California*, 384 U.S. 757, 770 (1966) ("Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned."). A warrantless search of a person's body implicates the "most personal and deep-rooted expectations of privacy," *Winston v. Lee*, 470 U.S. 753, 760 (1985), and is reasonable only if it falls within one of the Fourth Amendment's exceptions. *Missouri v. McNeely*, 133 S.Ct. 1552, 1558 (2013). A warrantless search of a person is reasonable only if it falls within a recognized exception. See, e.g., *United States v. Robinson*, 414 U.S. 218, 224 (1973). The importance of requiring authorization by a " 'neutral and detached magistrate' " before allowing a law enforcement officer to "invade another's body in search of evidence of guilt is indisputable and great." *Missouri v. McNeely*, 133 S.Ct. 1552, 1558 (2013) (quoting Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948)). The Supreme Court has set down a strict rule for strip searches: "to the extent that deeply intrusive searches are ever reasonable outside the custodial context, it surely must only be to prevent imminent, and serious harm." *New Jersey v. T.L.O.*, 469 U.S. 325, 382 n. 25 (1985).

Defendant Ullrich relies solely on his deposition testimony in support of his claim that the body cavity search of Plaintiff was supported by probable cause. Included in the facts are the unsupported assertions that Plaintiff "pull away at a high rate of speed" and that Plaintiff's actions

6

of "taking off at a high rate of speed upon seeing a police cruiser." (R. 28, Defendant's MSJ, Page ID# 85, 90). Neither statement is supported by evidence of record including either Defendant's body-worn camera video nor the uniform citation which were cited to by Defendant in support of these conclusions. Nothing in the record supports the fact that Plaintiff pulled away from a cruiser nor that he took off at a high rate of speed upon seeing Defendant's cruiser, including Defendant's deposition testimony. Therefore, the Court should not take this unsupported "fact" into account in reaching its decision.

Contrary to Defendant's statements and arguments, Defendant's dashcam video shows that Plaintiff pulled over roughly 30 seconds after Defendant turned on his emergency lights and that no furtive movements can be seen inside the vehicle during any time. The Supreme Court has held that, where a party's account is "blatantly contradicted" by video footage, "so that no reasonable jury could believe it," a court should not adopt that version of events for summary judgment purposes. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Defendant further argues that 1) Plaintiff's "blowing through a stop sign," 2) Plaintiff's statements that they are on the same side, and 3) Plaintiff's change in attitude after Defendant's refusal to be influenced by Plaintiff's statements are all indications that Plaintiff "was guilty of something." (R. 28, Page ID#90-91). Defendant does not explain how any of these "facts" provide any additional basis for probable cause to search Plaintiff. Plaintiff's running of the stop sign at Kavanaugh and 14th street is the basis for the stop but provides no additional probable cause to believe that Plaintiff had committed or was in the process of committing any other crime. Even Plaintiff's statements that they are "on the same side" provide no additional basis for probable cause. Whether those statements were made with the purpose of obtaining a favorable outcome on

7

the stop or in response to Defendant Ullrich's behavior leading up to that moment, would have no bearing on the probable cause assessment.

Finally, the body-worn camera footage also clearly contradicts Defendant's argument that Plaintiff's attitude changed in response to Defendant's refusal to by influenced by Plaintiff's statements. Throughout the entire encounter up to the body cavity search, Plaintiff is calm and deliberate. With the exception of his statement that Defendant did not have to be a "dick-sucker about it," Plaintiff is also courteous with Defendant. It is clear from the body-worn camera, that Plaintiff's one discourteous statement was in relation to Defendant's attitude, which was rife with hostility during the entire encounter.

Zino, Officer Richardson's canine, alerts to the odor of narcotics. Just because an officer does not find drugs does not mean that drugs are not present and that the odor is not there. (R. 32, Page ID#227). Richardson found an uncollectible amount of marijuana in Megan Sprague's purse. Id. at Page ID# 243-44. He does not recall where he found the single marijuana seed. Id. Richardson did not collect the seed. Id. at Page ID# 245-46. Arguably, under the totality of the circumstances, the only probable cause to believe that Plaintiff may be concealing drugs on his person is limited to the marijuana shake found in Ms. Sprague's purse and the marijuana seed that was found either in the purse or in Plaintiff's vehicle. Neither of these would allow Plaintiff to be charged with anything more than a misdemeanor possession charge.

**B. Defendant Ullrich's Body Cavity Search of Plaintiff's Rectum and Search of his Genitalia Violated Plaintiff's Clearly Established Right to be Free from Unreasonable Searches Under the Fourth Amendment**

This Court and the Sixth Circuit applied the *Bell* balancing factors to determine whether a particular search of suspect's person was unconstitutional:

> *Bell* mandates that we "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is

8

>conducted" when assessing whether an intrusive search is unreasonable and thus violative of the Fourth Amendment. *Id.* at 559, 99 S.Ct. 1861.

*United States v. Jackson*, 801 Fed. Appx. 941, 946 (6th Cir. 2020). Here, the scope of the intrusion was beyond that of a standard search incident to probable cause as it involved both a body cavity search and partial strip search. The justification for the search at most is the location of an unrecoverable amount of marijuana from the passenger's purse and a seed from an unknown location, and was conducted in public, in view of at least eight officers, the passenger, and anyone that may have been awake in the houses nearby.

The nature of the intrusion in this case is far more significant than Officer Ullrich's intrusion in *Jackson*. First, the search was performed outside on a street lined with houses and while Plaintiff was surrounded by at least eight other officers including a female officer standing behind Plaintiff. The search lasted much longer than the search in *Jackson*, and even by Defendant Ullrich's testimony was significantly more intrusive. Like *Amaechi*, the search of Plaintiff involved characteristics of both a strip search and a body cavity search. *See Amaechi v. West*, 237 F.3d 356, 363-64 (4th Cir. 2001). Defendant Ullrich's search of Plaintiff begins at time stamp 6:41:06 and continues to time stamp 6:42:08 of his dashcam video. (R. 33-1- Dashcam Video). In the course of roughly one minute of hands-on searching, Defendant Ullrich admits to looking down the back of Plaintiff's underwear, running his hand up Plaintiff's butt-crack from top to bottom, moving Plaintiff's penis and scrotum to check behind them, and admits to manipulating Plaintiff's scrotum. (R. 30, Page ID# 146-150). In addition to Defendant Ullrich, another officer is close by, shining a light to illuminate Plaintiff's backside while Defendant Ullrich searched. (See R.33-1- Dashcam Video)(filed conventionally).

In *Sowders*, the Sixth Circuit looked to the First Circuit for descriptions of the three types of nude body searches.

> A "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities. *Blackburn*, 771 F.2d at 561 n. 3; cf. *Bell*, 441 U.S. at 558 n. 39, 99 S.Ct. at 1884 n. 39 (emphasizing that search of prisoner was a visual one but not a manual one).

*Spear v. Sowders*, 433 F.3d 576, 634 (6th Cir. 1995). The search conducted by Defendant Ullrich invaded Plaintiff's privacy rights beyond that of a visual search. *See United States v. Doxey*, 833 F.3d 692, 705 (6th Cir. 2016) (stating, "There is no question in this case that Trooper Marshall's flicking a baggie from in-between Doxey's buttocks invaded Doxey's privacy interests beyond that of a visual search.").

Unlike *Jackson*, where Ullrich pulled Jackson's pants straight out and looked into them then pulled out the package of methamphetamine within five seconds, this search took close to a minute, involved physical manipulation of Plaintiff's genitalia and buttocks, insertion of his finger into Plaintiff's rectum, and included at least a partial strip search witnessed by other officers. Additionally, Plaintiff was not under arrest at the time of the search. Unlike *Jackson*, Plaintiff was not on parole or probation and was charged only with running a stop sign. Significantly, Plaintiff also testified that Defendant Ullrich grabbed his penis to search between his penis and scrotum and down and around his scrotum. (R. 31 at Page ID# 183, p. 98-99). Plaintiff also testified that while searching his backside, Defendant Ullrich penetrated his rectum. Id. at Page ID#183, p. 99. Defendant Ullrich's search of Plaintiff constituted both a partial strip search and a manual body-cavity search.

Such a search was not warranted by Defendant's justification for initiating the search. The reason for the search was to locate suspected drugs that Defendant Ullrich believed that Plaintiff had hidden in his rectum. His reason for this belief was the thirty seconds that it took for Plaintiff

10

to come to a stop, Plaintiff's movements during that time inside the car, Plaintiff name dropping his boss, Plaintiff becoming belligerent, and reaching to his waistband when he got out of the car. (R. 30, Page ID#133-37). Beyond these factors, Defendant Ullrich does not independently recollect any other factors to justify the search as conducted. (Id. at Page ID# 137). In fact, such a search is not even allowed under Covington Police Department Policies and Procedures.

Covington Police Department Policy 5.2.6, requires that body cavity searches be performed only medical personnel, in a medical facility pursuant to a search warrant or court order:

> **5.2.6 Body Cavity Search (CALEA 1.2.8a-b)**
>
> A. If the visual examination of a suspect during a strip search or other information leads an Officer to believe that the individual is concealing a weapon, evidence or contraband within a body cavity, the Officer shall consult with his/her immediate Supervisor to determine whether probable cause exists to seek a search warrant for a body cavity search.
> B. Body cavity searches shall be performed only by medical personnel in a medical facility, pursuant to a search warrant or court order.

(Exhibit 1- CPD G.O. 05.02, p. 3)

In support of his motion, Defendant cited to three cases. *Banks* is distinguishable from the conduct in this case as the search was conducted pursuant to a search warrant and conducted in a medical setting. *United States v. Banks*, 684 Fed. Appx. 531 (6th Cir. 2017). *Booker* supports Plaintiff's claims. The Sixth Circuit held that in that case that the warrantless search was unreasonable. *United States v. Booker*, 728 F.3d 535 (6th Cir. 2013. The Sixth Circuit found that the while the risk of the procedures used in the search were not apparently extremely high, the fact that they were the subject of dispute may weigh against finding the intrusion to be unreasonable. *Id.* at 546. The Court of Appeals placed significant importance on the affront to human dignity of the procedures performed: being paralyzed with medication, intubated, and anally probed without consent. *Id.* at 547. The Court of Appeals also found that there were less intrusive means of

11

obtaining any contraband such as taking an x-ray and then if necessary to whether to engage in a monitored bowel movement. *Id.*

*Ruffin* involved a body cavity search performed by medical personnel with one officer present, under the authority of a search warrant. *United States v. Ruffin*, 979 F.3d 528, 531 (6th Cir. 2020). The Sixth Circuit held 1) that the dangers posed by the rectal exams, enemas, and x-rays posed little threat compared to the danger of concealing drugs in Ruffin's rectum, 2) that the presence of the warrant decreased the level of dignitary intrusion, and 3) that the search was not overly intrusive where the officers found bags with drug residue and a string hanging out of Ruffin's anus. *Id.* at 533-34.

Unlike any of the cases cited by Defendant, the body cavity search that Plaintiff was subjected to was conducted by an officer in the field while handcuffed and in plain view of multiple witnesses and houses that lined the streets. All three cases cited to by Defendant involved searches performed by medical personnel. It is hard to say what danger the search posed to Plaintiff, but the affront to human dignity and the government's need for evidence factors are clearly in favor of Plaintiff. Specifically, there was no basis for probable cause to believe that Plaintiff was involved in drug trafficking or any additional criminal activity beyond running a stop sign.

As previously stated, those factors cited by Defendant in his motion for summary judgement provide no basis for probable cause to believe that Plaintiff was concealing a weapon, evidence, or contraband in his rectum. The total amount of time that it took Plaintiff to come to a complete stop was roughly 30 seconds at slow speed. (R. 30, Page ID# 134). This entire period is captured on dashcam, and careful review of those thirty seconds show little to no movement by either Plaintiff or his passenger. (R. 33-1- Dashcam; 6:12:56- 6:13:58). The body-worn camera of Defendant Ullrich also belies his statement that Plaintiff became belligerent. In fact, Plaintiff's

demeanor is generally calm and at some point after Defendant Ullrich states that he does not know Plaintiff's boss, Plaintiff simply states in calm voice, "you don't gotta be a dick-sucker man" after Defendant became aggressive with him. (R. 28-5, Ullrich BWC, Timestamp 6:13:45- 6:18:03). During the entire stop, Plaintiff is calm and collected and appears readily to be trying to comply and anticipate Defendant's requests. When Plaintiff exits the vehicle, he instinctively reaches to make sure his shirt is pulled down and not riding up his torso. (R. 33-1 1- Dash Cam at 6:18:23- 6:18:27). At which point Defendant performs a Terry frisk and places Plaintiff in handcuffs.

      Here, the video evidence of record establishes that, at most, Defendant Ullrich's only probable cause to believe that Plaintiff had hidden contraband at this point in the stop is that it took roughly 30 seconds to complete the stop and an unrecoverable amount of marijuana found in the passenger's purse along with a single marijuana seed. The Supreme Court has held that, where a party's account is "blatantly contradicted" by video footage, "so that no reasonable jury could believe it," a court should not adopt that version of events for summary judgment purposes. *Scott v. Harris*, 550 U.S. 372, 380 (2007). In total, these factors are what led Defendant to believe that Plaintiff had hidden illegal drugs in his rectum. There was no other evidence pointing to any sort of trafficking charge, and not even enough marijuana to charge Plaintiff with misdemeanor possession as it was unrecoverable.

      The scope of the particular intrusion on Plaintiff was severe. He was subjected to a partial strip search and body-cavity search by Defendant and at least eight officers in the vicinity and had his genitalia and butt-crack fondled for close to a minute while in a residential neighborhood with houses nearby and after Defendant had blasted his air horn. Defendant did not conduct the intrusive search at a police station or a jail after arrest. Plaintiff was never arrested but was rather temporarily detained. Ultimately the justification for the search was the 30 seconds it took Plaintiff

to stop and the discovery of an unrecoverable amount of marijuana shake and a single marijuana seed found in his passenger's purse. The right to be free from warrantless body cavity and strip searches in this fashion has been clearly established through Bell and this Court's analysis in Jackson under *Amechi* and *Lafayette*. See Jackson supra, 2018 WL 4938697 at *4 (citing *Amechi v. West*, 237 F.3d 356 (4th Cir. 2001); *Illinois v. Lafayette*, 462 U.S. 640 (1983)). The *Bell* factors weigh heavily in favor of Plaintiff who was was subjected to a strip search and body cavity search without being under arrest and without a warrant by a police officer in public in front of at least eight other people and residences when there was no probable cause to believe that at max Plaintiff could be charged with misdemeanor possession. Therefore, Plaintiff respectfully requests that the Court find that the intrusive search conducted by Defendant Ullrich was objectively unreasonable in violation of the Fourth Amendment and deny Defendant's motion for summary judgment.

## IV. PLAINTIFF IS VOLUNTARILY DISMISSING HIS CIVIL CONSPIRACY CLAIM

As only one party is left in this matter, Plaintiff's civil conspiracy claim is no longer viable and Plaintiff is voluntarily dismissing same. Should the Court require an Agreed Order of Dismissal, or Motion, Plaintiff will gladly oblige.

## V. OFFICER ULLRICH IS NOT ENTITLED TO SUMMARY JUDGMENT ON CUNDIFF'S FIRST AMENDMENT RETALIATION CLAIM

Defendant's final argument in support of his motion for summary judgment claims that Plaintiff failed to establish the elements of a first amendment retaliation claim. Alternatively, Defendant argues entitlement to qualified immunity on this claim. While government officials who perform discretionary functions receive "qualified immunity," which protects them from liability for civil damages the officials are only entitled to this privilege if their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021)

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To adequately plead a First Amendment retaliation claim, a plaintiff must allege: (1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct. *Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir.2005). First Amendment Retaliation claims have been clearly established since at least 2006. (See *Hartman*, supra).

Here, Plaintiff made a statement to Defendant in response to the increasing hostility that he was displaying. (See R. 28-5, at 6:18:01 to 6:18:06 and 6:18:38 to 6:18:44). An exchange took place where Plaintiff made a comment to Defendant Ullrich saying, "you don't gotta be a dick-sucker, man," to which Defendant responded, "I'm trying not to be a dick-sucker." (R. 28-5, at 6:18:01 to 6:18:06). Plaintiff later stated, "I'm on the same team as you guys," to which Defendant responded, "Well, I'm a dick-sucker so you're probably not on my team." (R. 28-5, at 6:18:38 to 6:18:44). Plaintiff was engaged in constitutionally protected conduct when he made his comment in response to Defendant's hostility.

While it may be reasonable for some to get upset by such language, police officers are held to higher standards than the citizens they serve and protect, and the courts have made this quite clear. The Supreme Court and Sixth Circuit have clarified that police officers must exercise more remarkable restraint in their response than the average citizen. *Wood v. Eubanks*, 25 F.4th 414, 423 (6th Cir. 2022) citing *Barnes v. Wright*, 449 F.3d 709, 718 (6th Cir. 2006). Police officers are

15

held to a higher standard than average citizens, because the First Amendment requires that they "tolerate coarse criticism." *D.D. v. Scheeler*, 645 F. App'x 418, 425 (6th Cir. 2016). The freedom of individuals verbally to oppose or challenge police action without thereby risking punishment is one of the principal characteristics by which we distinguish a free nation from a police state. *City of Houston, Tex. v. Hill*, 482 U.S. 451, 463, 107 S. Ct. 2502, 2510, 96 L. Ed. 2d 398 (1987).

After Plaintiff's statement, Plaintiff was pulled out of the car for a terry frisk and was immediately cuffed even though he moved with normal speed and deliberation in putting his hands on the hood of the car for the frisk. Plaintiff's car was then searched by a canine, he was then searched again with Defendant Ullrich fondling his genitalia and penetrating his rectum. The totality of any arguable probable cause for such a search is the an unrecoverable amount of marijuana found in his passenger's purse. Performing a drug-dog search of Plaintiff's vehicle, partial strip-search, and a body cavity search to punish Plaintiff for the insulting statement would deter any person of ordinary firmness from verbalizing even a remote displeasure with the police. In *Campbell*, the Sixth Circuit held that conducting an invasive strip and/or body cavity search fulfilled the second element of a First Amendment Retaliation claim because the search was done "in an overly aggressive manner, including by jostling Campbell's genitals and inserting his finger into Campbell's anus." *Campbell v. Mack*, 777 F. App'x 122, 135 (6th Cir. 2019). These facts are nearly identical to the case at hand. Thus, a reasonable jury could conclude that Defendant Ullrich's actions would deter a person of ordinary firmness from continuing to engage in trash talk critical of a police officer.

Defendant's conduct initiating the cavity search goes to the third element of a First Amendment retaliation claim, where a reasonable jury could find that Defendant Ullrich performed the invasive search of Plaintiff's person because of Plaintiff's comment. After Plaintiff made the

16

comments mentioned above, Defendant repeatedly accused Plaintiff of hiding contraband in his rectum. Defendant made these accusations to Plaintiff as well as other officers on scene throughout the traffic stop. (R. 28-5, at 6:25:37 to 6:25:54; 6:28:12 to 6:28:23; 6:47:15 to 6:47:18). This includes Defendant Ullrich asking Plaintiff, "What do you got hidden up inside of you?" to which Plaintiff replied, "I don't have nothing hidden inside of me." (R. 28-5, at 6:42:12 to 6:42:16). Plaintiff then inquired, "Isn't that what you said, inside of me?" to which Defendant Ullrich responded, "Yes, inside of you. Something shoved right up into your butt." (R. 28-5, at 6:42:18 to 6:42:23). This exchange occurred while Defendant was performing the search of Plaintiff's person. After Plaintiff was released from the stop, Defendant makes the statement: "I'm still, I'm still red." (R. 28-5 at 6:46:35 to 6:46:31).

In addition to proving that his protected conduct was the motivating factor behind any harm, once a plaintiff has established that retaliation was the result of his protected conduct, if the defendant can show he would have taken the same action if it had not been for the protected activity, he can be awarded summary judgment; this showing cannot be made by simply denying the plaintiff's allegations. *Hazel v. Quinn*, 933 F. Supp. 2d 884, 890 (E.D. Mich. 2013). Still, whether a government official's retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her First Amendment rights is a question of fact. *Campbell v. Mack*, 777 F. App'x 122, 134 (6th Cir. 2019) citing *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). "Thus, unless the claimed retaliatory action is truly 'inconsequential,' the plaintiff's claim should go to the jury." Id. (quoting *Thaddeus–X*, 175 F.3d at 398).

Defendant Ullrich is not entitled to qualified immunity with respect to Plaintiff's First Amendment retaliation claim. Like in *Campbell*, at the time this incident ensued, the right to be free from retaliation by government officials, including police officers, for asserting one's First

Amendment rights was "sufficiently clear" so that a reasonable officer would know that retaliating against Plaintiff for trash talk would violate his First Amendment rights. *Campbell*, 777 F. App'x 122, 136 (6th Cir. 2019).  Defendant Ullrich should have known that conducting an aggressive partial strip search and body cavity search in retaliation for Plaintiff's First Amendment rights violated clearly established law.  Therefore, a reasonable officer would have known that retaliating against Plaintiff for his constitutionally protected speech would violate the First Amendment.

VI. **Conclusion**

In conclusion, Defendant's Motion for Summary Judgment should be denied, as genuine issues of material fact exist, and the matter should proceed to trial.

Respectfully submitted,

/s/ Christopher D. Roach
Christopher D. Roach (95007)
Benjamin T.D. Pugh (94032)
PUGH & ROACH, ATTORNEYS AT LAW, PLLC
28 West Fifth Street
Covington, KY 41011
859.291.5555
chris@prlaw.legal; tom@prlaw.legal

**CERTIFICATE OF SERVICE**

I hereby certify that on December 27, 2022, a copy of the foregoing notice was served upon all counsel of record via the Court's CM/ECF system.

/s/ Christopher D. Roach
Christopher D. Roach