UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON
CASE NO. 2:21-CV-00072-DLB

**JEFFREY CUNDIFF**                                                                          **PLAINTIFF**

**v.**

**DOUGLAS ULLRICH,** *et al.*                                                   **DEFENDANTS**

---

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

Defendant, Douglas Ullrich, in his individual capacity as a Covington, Kentucky, Police Officer, by and through counsel, respectfully submits this Reply Memorandum in Support of his Motion for Summary Judgment.

**I.  OFFICER ULLRICH IS ENTITLED TO SUMMARY JUDGMENT ON CUNDIFF'S FOURTH AMENDMENT CLAIM**

    **A.  THE SEARCH WAS REASONABLE AND, THEREFORE CONSTITUTIONAL**

        **1.  There was probable cause for the search.**

Cundiff argues the search was not reasonable – and therefore in violation of the Fourth Amendment's proscription on "unreasonable" searches – because Officer Ullrich lacked probable cause to believe that he had stored contraband in his rectum. (R.39 Response at PageID 285 – 287)

Cundiff first contends that the record does not support Officer Ullrich's testimony that he "pulled away at a high rate of speed … upon seeing a police cruiser." (*Id.* at 285 – 286) However, Officer Ullrich's cruiser camera video shows that he turned onto Kavanaugh Street heading southbound, and that, as soon as he did, Cundiff drove down Kavanaugh Street at a high rate of speed, going through a stop sign as he did. (R.28-1 Video at 6:12:27 – 6:12:40) That Cundiff was traveling at a high rate of speed is clear from the fact that Officer Ullrich

1

had to increase his driving speed (as evidenced by the increasing rate at which Officer Ullrich's cruiser passes stationary objects in the camera frame) to catch up to Cundiff and by the fact that he had to brake for a relatively long time before he could stop at the next stop sign once Officer Ullrich was closer behind him. (*Id.* at 6:12:27 – 6:12:50) Cundiff was traveling at such a high rate of speed because he noticed Officer Ullrich behind him and wished to avoid law enforcement. (Ullrich Depo., p. 13, 20 – 21) Indeed, Cundiff's passenger, Megan Sprague, testified that Cundiff was "high" on drugs at the time of the traffic stop and "didn't want to stop," to prevent Officer Ullrich from catching him under the influence of drugs. (Sprague Depo., p. 13, 15) So, contrary to Cundiff's argument, the record *does* support Officer Ullrich's testimony that Cundiff "pulled away at a high rate of speed … upon seeing a police cruiser." (*Id.* at 285 – 286)

     Next, Cundiff argues that available video blatantly contradicts Officer Ullrich's testimony that he could see Cundiff moving inside his car, reaching toward Sprague, lifting himself up off the driver's seat, and reaching underneath himself. (R.39 Response at PageID 286) It does not. Given the quality of the video, glare from the lights on Officer Ullrich's cruiser, and the angle from which the video is taken, it does not clearly depict what Cundiff was doing inside the car in the thirty seconds between the time Officer Ullrich activated the overhead lights and the time Cundiff finally stopped. (R.28-1 Video at 6:12:50 – 6:13:22) That, however, does not mean that Cundiff did not move as Officer Ullrich described in his testimony. In fact, during the same period, the numbers on Cundiff's license plate and the stickers in his rear window are not visible, either, given the quality of the video, glare from the lights on Officer Ullrich's cruiser, and the angle from which the video is taken. (R.28-1 Video at 6:12:56 - 6:13:22) That does not mean that Cundiff's license plate did not have

2

numbers or that Cundiff's vehicle did not have stickers. It just means that the video could not pick up those details – just like it could not pick up the details about Cundiff's acts inside the car. Thus, the video does *not* contradict Officer Ullrich's testimony.

Finally, Cundiff argues that the remaining facts – which he limits to the fact that Cundiff blew through a stop sign, Cundiff's attempt to curry favor with Officer Ullrich by saying they were "on the same side," and Cundiff's change in attitude after it became clear that Officer Ullrich would not be influenced by Cundiff's name-dropping – fail to establish probable cause. Probable cause, of course, depends on the totality of the circumstances, *U.S. v. Pointer*, 2022 U.S. App. LEXIS 35506 (6th Cir.), and Cundiff's argument does not take the totality of the circumstances into account.

The totality of the circumstances includes a lot more than what Cundiff will acknowledge. As demonstrated, the video record demonstrates that after Officer Ullrich turned onto Kavanaugh Street, he saw Cundiff take off at a high rate of speed, running a stop sign in the process. (R.28-1 Video at 6:12:27 – 6:12:40) Officer Ullrich perceived that Cundiff did so because he had seen Officer Ullrich turn onto the street behind him and wished to avoid law enforcement. (R.30, Ullrich Depo. at PageID 127, 134 – 135) Officer Ullrich activated his cruiser's overhead lights to initiate a traffic stop. (R.28-1 Video at 6:12:50 – 6:12:52) Cundiff did not immediately stop, as the record plainly demonstrates. (R.28-1 Video at 6:12:50 – 6:13:22) Cundiff's initial failure to stop had nothing to do with a desire to be "out of the way of traffic" or finding a "safe [place] to stop," as Cundiff suggests. (R.39 Response at PageID 281) The video evidence plainly demonstrates that there was no other traffic in sight at the time of the 2:00 a.m. traffic stop. (R.28-1 Video at 6:12:50 – 6:13:22) Instead, Cundiff was reluctant to stop because he was high on drugs. (Sprague, p. 13, 15) In the thirty

3

seconds it took Cundiff to eventually stop, Officer Ullrich saw Cundiff moving inside his car, including lifting himself up off his seat, and reaching underneath himself. (R.30, Ullrich Depo. at PageID 130, 134) Given his training and experience, Officer Ullrich believed Cundiff's behaviors were typical of persons who hide drugs on their bodies. (R.30, Ullrich Depo. at PageID 130, 134) When Officer Ullrich approached Cundiff's vehicle, Cundiff began dropping names and claiming to be "on the same side" as Officer Ullrich, which suggested that Cundiff felt he was guilty of something bigger than running a stop sign. (R.30, Ullrich Depo. at PageID 127, 134 – 135) Then, Cundiff and Sprague began openly discussing their drug use with a female officer. (R.28-7 Video 6:28:27 – 6:40:58) And, a drug detection canine handled by Officer Richardson alerted to the odor of drugs in Cundiff's vehicle. (R.32, Richardson Depo. at PageID 223 – 224) In fact, marijuana seeds were located inside the vehicle. (R.28-5 Video at 6:38:44 – 6:38:50)

Those facts, considered *in toto*, gave rise to a reasonable belief on Officer Ullrich's part that there was a fair probability that contraband would be found on Cundiff's person. Consequently, the search was reasonable.

### 2. The search was reasonable in scope.

#### a. Officer Ullrich did not conduct a strip search.

Cundiff repeatedly contends he was subjected to a "partial strip search." (R.39 Response at PageID 280, 285, 288, 289, 292, 293, 295, 297) This is simply not so. Cundiff remained fully clothed during the entire traffic stop, including specifically during the search of his person by Officer Ullrich. (R.28-1 Video at 60:40:59 – 6:42:32)[1] During the search, the

---

[1] R.28-1 was mistakenly labeled in Officer Ullrich's MSJ as "Ullrich Body Worn Camera" (R.28-1 at PageID 100); actually it is video from Officer Ullrich's Cruiser Camera. Likewise, R.28-5 was mistakenly labeled in Officer Ullrich's MSJ as "Ullrich Body Worn Camera" (R.28-1 at PageID 109); actually, it is the body worn camera of another officer whose only role in these events was to help Officer Richardson search Cundiff's vehicle. And,

4

waistband of Cundiff's underwear was briefly pulled away from his body, which exposed part of Cundiff's buttocks for no more than two seconds to Officer Ullrich. (R.28-3 Video at 6:41:26 – 6:41:27) Cundiff's buttocks were not visible to anyone else on the scene. (R.28-1 Video at 6:40:59 – 6:42:32)

This was certainly *not* a strip search, or even a partial strip search. "A strip search, though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities." *U.S. v. Chism*, 2021 U.S. Dist. LEXIS 89809 (E.D. Tenn.), quoting *Spears v. Sowders*, 71 F.3d 626 (6th Cir. 1995). Officer Ullrich did not inspect Cundiff's naked body, and the fleeting glimpse of part of Cundiff's buttocks during a fully clothed search did not convert the encounter into a strip search.

In fact, in another case, a subject was made to remove his pants, leaving him in his underwear, shirt and socks, and officers pulled the waistband of the subject's underwear away from his body during a search that was recorded by a video camera. *Chism*, *supra*. The subject argued that the removal of even one item of clothing constituted a strip search and that the video recording of the "strip search" violated his Fourth Amendment rights. *Id.* But, the Court ruled that a search conducted in that manner "does not meet even a liberal definition of a strip search." *Id.*

In this case, the search was even less intrusive, as Cundiff was not required to remove any clothing. Hence, Cundiff was not subject to a partial strip search.

        **b.**      **The scope of the search was reasonable.**

---

R.28-7 was generically labeled as "Body Worn Camera Video"; to be more specific, it is video from the body worn camera of a female officer who spoke at length with Cundiff and Sprague at the scene.

5

In his Motion, Officer Ullrich analyzed three cases in demonstrating that it was constitutionally reasonable for him to allegedly place "part of a finger" in Cundiff's rectum[2] in a manner that caused no physical injuries to Cundiff and that did not even cause Cundiff to flinch (R.28-1 1at 6:40:59 – 6:42:32; R.31, R.30 Cundiff Depo. at PageID 183, 186 (p. 99, 110 – 111) to locate drugs he believed Cundiff had hidden on his person. Specifically, Officer Ullrich analyzed *U.S. v. Booker*, 728 F.3d 535 (6th Cir. 2013), which held that paralyzing and intubating a person for the purpose of conducting a body cavity search while the person was naked and handcuffed was unreasonable; *U.S. v. Banks*, 684 Fed. Appx. 531 (6th Cir. 2017), which held that taking an x-ray and giving a person laxatives in an effort to secure evidence secreted in a body cavity was reasonable; and *U.S. v. Ruffin*, 979 F.3d 528 (6th Cir. 2020), which held that conducting a full rectal examination in an effort to secure evidence was reasonable, even though the person was shackled during the examination and even though officers present joked about the intrusion into the person's body.

Cundiff attempts to distinguish these cases on the basis that the searches were not "conducted by an officer in the field while [the subject was] handcuffed and in plain view of multiple witnesses and houses that lined the streets." (R.39 Response at PageID 291) That is a distinction without a difference and fails to support the proposition that the search conducted by Officer Ullrich was unreasonable.

First, to the extent Cundiff suggests that "multiple witnesses" and persons in "houses that lined the street" saw him naked during what he previously described as a "strip search," the description is completely refuted by the record evidence. As previously demonstrated,

---

[2] Officer Ullrich denies he penetrated Cundiff's rectum in any way, shape, or form. However, for purposes of this motion, and the governing standard, he takes Cundiff's story as true.

6

none of Cundiff's clothing was removed during this search. Therefore, he was undeniably *not* naked during this search. Further, this fully clothed search was conducted at 2:00 a.m., and did not draw any attention from passersby or neighbors. As the video record plainly demonstrates, there are no neighbors on the street, on their porches, or looking out their windows; and no one has come forward to say they saw any part of the search. (See R.28-1, 3, 5 and 7, generally) While, there were police officers on the scene, none of them saw Cundiff naked. And, if, as Cundiff claims, Officer Ullrich placed "part of a finger" in Cundiff's rectum, there is no evidence any police officer on the scene was aware that happened; it is not captured on any of their body cameras. (*Id.*)

Thus, the only true distinction Cundiff makes between his search and the searches in *Booker*, *Banks*, and *Ruffin* is that the searches in those cases were conducted in a medical setting, while his search was conducted "in the field." A search "in the field" is not, however, necessarily unreasonable.

First, Cundiff does not cite any precedent to support a conclusion that conducting a search "in the field" is *per se* unreasonable.

Second, performing a search in a medical setting is not necessarily more private than conducting a search "in the field." *Booker*, *Banks*, and *Ruffin* all demonstrate as much. The search in *Booker* was conducted in a hospital, where multiple officers saw the subject fully naked. The search in *Banks* was also conducted in a hospital, but at least one officer saw the subject sit on the toilet and release drugs from his body. And, the search in *Ruffin* was likewise conducted in the hospital, where several officers were present, witnessed it, and joked about it. By comparison, the search conducted by Officer Ullrich was actually *more* private than these other three searches, as no one on the scene saw any part of Cundiff's

7

naked body, and no one on the scene seemed to be aware of the search. Specifically, no one else on the scene – including Cundiff – reacted in such a way as to suggest they knew Officer Ullrich had (allegedly) placed "part of his finger" in Cundiff's rectum during this search.

Further, Cundiff's assertion that Officer Ullrich violated City policy by conducting the search in the field (R.39 Response at PageID 290) does not, standing alone, render the search constitutionally unreasonable. The violation of a police policy or procedure does not, in and of itself, give rise to a constitutional violation. *Smith v. Freland*, 954 F.3d 343 (6th Cir. 1992).

Finally, Cundiff cites *United States v. Jackson*, 801 Fed. Appx. 941 (6th Cir. 2020), apparently in support of the proposition that the search in this case was unreasonable under the circumstances. Cundiff's reliance on that case is curious, since the Sixth Circuit ruled that the search in that case – which, coincidentally, involved a similar search conducted by Officer Ullrich on a previous occasion on a public street and in view of bystanders – *was reasonable*.

In sum, because Officer Ullrich's search of Cundiff was reasonable, Officer Ullrich is entitled to summary judgment on Cundiff's Fourth Amendment claim.

### B. OFFICER ULLRICH IS ENTITLED TO QUALIFIED IMMUNITY

Assuming *arguendo* the search was not reasonable, Officer Ullrich is entitled to qualified immunity because there is no precedent holding that a similar search conducted in a similar manner was unreasonable.

In arguing to the contrary, Cundiff points to two cases, *Amaechi v. West*, 237 F.3d 356 (4th Cir. 2001), and *Illinois v. Lafayette*, 462 U.S. 640 (1983). (R.39 Response at PageID 293) But, those cases do not support a conclusion that it was "clearly established" that the type of search Officer Ullrich conducted in this case was unconstitutional.

8

First, *Amaechi* was a Fourth Circuit case, which does not carry the same weight in determining whether a right was clearly established as would precedent from the Sixth Circuit. *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013). Moreover, the facts in *Amaechi* were markedly different than the facts here. In that case, an officer responded to Amaechi's house in response to her neighbor's complaint that Amaechi's teenagers were playing their music too loudly. When the officer asked her to turn down the music, Amaechi complied, and the officer said he would not arrest her as long as no further noise complaints were received, and none were. Later, the officer learned that Amaechi had lodged a complaint about the manner in which he had conducted himself when he handled the call at Amaechi's house. Two days after the noise complaint was received, the officer applied for a warrant to arrest Amaechi. Other officers went to her house to execute the warrant, arriving as Amaechi was fully undressed and getting ready for bed. When they knocked on her door, Amaechi covered herself with a robe and went to the door. An officer placed Amaechi in handcuffs, causing her robe to fall down, revealing her fully naked body. The officer escorted Amaechi to his cruiser, passing other officers who saw Amaechi's naked body. And, before he would allow Amaechi into his cruiser, he conducted a search incident to arrest, in which he squeezed her hips, "swiped" an ungloved hand, palm up, across her bare vagina, penetrated her vagina with his fingertip, placed his hand "up into" her buttocks, and kneaded her butt cheeks, all in front of other police officers and Amaechi's husband, five children, and several neighbors. Under those circumstances, the court ruled that the search was unreasonable.

The factors that made the search in *Amaechi* unreasonable are not present here. First, there was no reason whatsoever for the officer in *Amaechi* to suspect Amaechi had any drugs secreted hidden on her person. But, in the present case, Officer Ullrich had multiple reasons

9

to believe that Cundiff had drugs hidden on his person. Here, it took Cundiff thirty seconds to pull over; Officer Ullrich perceived that Cundiff was moving around inside the vehicle in a manner that suggested he was hiding something on his body; a drug detection canine had alerted on Cundiff's vehicle; marijuana seed was found in the vehicle; and Cundiff and his passenger spoke openly about their drug use to an officer on the scene. Additionally, the search in *Amaechi* was unreasonable because the warrant was questionable; the warrant was only secured two days after a complaint about the occurrence of a minor misdemeanor was completely resolved, with no further complaints, and only after the officer who had effected the resolution learned that Amaechi had complained about his conduct. There is no such circumstance in the present case; there is no evidence of any prior interaction between Officer Ullrich and Cundiff, nor any reason to believe that Officer Ullrich conducted the search to be vengeful or spiteful. Further, the search in *Amaechi* was unreasonable because she was completely naked and in full view of multiple police officers, her husband, five children, and several neighbors. Here, Cundiff was fully dressed; no one could see his naked body; and if, as Cundiff claims, Officer Ullrich penetrated Cundiff's rectum with "part of his finger," no one on the scene appeared to be aware of that occurrence. In short, the circumstances that made the search in *Amaechi* unreasonable are not present in this case, such that *Amaechi* is not sufficiently on point to "clearly establish" that the search Officer Ullrich conducted was unreasonable.

Likewise, *Lafayette* is not sufficiently on point to "clearly establish" that the search Officer Ullrich conducted was unreasonable. In fact, *Lafayette* did not even involve the search of a subject. Rather, in *Lafayette*, "the question her [was] whether, consistent with the Fourth Amendment, it is reasonable for police to search the personal effects of a person under lawful

10

arrest as part of the routine administrative procedure at a police station house incident to booking and jailing the suspect." *Lafayette, supra* at 643.

Cundiff, who bears the burden to overcome qualified immunity, has not identified any case law holding that a search of the type conducted by Officer Ullrich, under the particular circumstances that existed on July 8, 2020, was unconstitutional. Therefore, Officer Ullrich is entitled to qualified immunity from liability.

## II.  OFFICER ULLRICH IS ENTITLED TO SUMMARY JUDGMENT ON CUNDIFF'S FIRST AMENDMENT RETALIATION CLAIM

Officer Ullrich moved for summary judgment on Cundiff's First Amendment retaliation claim because Cundiff could not establish a causal connection between the fact that he called Officer Ullrich a "dick sucker" and the search Officer Ullrich conducted. Officer Ullrich's argument was premised on *Hartman v. Moore*, 547 U.S. 250 (2006) and other case law holding that a plaintiff cannot establish such a causal connection where the defendant's actions were justified by the existence of probable cause. (R.28 MSJ at PageID 98) Cundiff's Response does not address this argument; instead, Cundiff argues he can satisfy all three elements of a First Amendment retaliation claim. (R.39 Response at PageID 293 – 296) As demonstrated by the case law Officer Ullrich has cited, Cundiff's claim fails as a matter of law if Cundiff cannot establish an absence of probable cause.

Alternatively, Officer Ullrich is entitled to qualified immunity from liability. Cundiff's only argument is that Officer Ullrich "should have known that conducting an aggressive partial strip search and body cavity search in retaliation for" the fact that Cundiff engaged in "trash talk" against Officer Ullrich would violate Cundiff's rights. (R.39 Response at PageID 296 – 297) But, that argument defines the right at a too high a level of generality and does not address the specific circumstances that existed in this case. For example, case law holds

11

that a plaintiff cannot establish such a causal connection where the defendant's actions were justified by the existence of probable cause. *E.g.*, *Hartman v. Moore*, 547 U.S. 250 (2006). Therefore, a police officer who has probable cause for a search is justified in believing that he cannot be liable for retaliating against a trash-talking subject for the trash talk if he conducts the search. In other words, such a police officer is not expected to know that conducting a search for which probable cause exists would subject him to liability for First Amendment retaliation. That begs a question Cundiff has not answered: If probable cause does not actually exist for a search, is a police officer who reasonably, though mistakenly, believed that probable cause did exist expected to know that he can be liable under the First Amendment for retaliating against a trash-talking subject if he conducts the search? Cundiff, who bears the burden on that point, has not demonstrated that such an officer is not entitled to qualified immunity.

### III.     OFFICER ULLRICH IS ENTITLED TO SUMMARY JUDGMENT ON CUNDIFF'S CONSPIRACY CLAIM

Since Cundiff has agreed to voluntarily dismiss his conspiracy claim (R.39 Response at PageID 293), Officer Ullrich is entitled to summary judgment on that claim.

### IV.     CONCLUSION

For all these reasons, and in light of the authorities cited in his Motion, Officer Ullrich respectfully requests that the Court grant summary judgment in his favor on all claims asserted against him.

Respectfully submitted,

*/s/ Jeffrey C. Mando*
Jeffrey C. Mando, Esq. (#43548)
Jennifer L. Langen, Esq. (#87960)
ADAMS LAW, PLLC
40 West Pike Street
Covington, KY  41011
859.394.6200 | 859.392.7200 – Fax
jmando@adamsattorneys.com
jlangen@adamsattorneys.com

*Attorneys for Defendant, Douglas Ullrich, in his individual capacity as a Covington, Kentucky Police Officer*

## CERTIFICATE OF SERVICE

I hereby certify that **13th** day of January, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:  Christopher D. Roach, Esq. and Benjamin T.D. Pugh, Esq.

*/s/ Jeffrey C. Mando*
Jeffrey C. Mando, Esq.