UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

NORTHERN DIVISION AT COVINGTON

CASE NO. 2:21-CV-00072-JMH


JEFFREY CUNDIFF                          PLAINTIFF

vs.

DOUGLAS ULLRICH, ET AL.                  DEFENDANTS



* * * * * * * *

DEPONENT:          MEGAN ELIZABETH SPRAGUE

DATE:              NOVEMBER 3, 2022

* * * * * * * *




Tina M. Barlow, CCR

Certified Court Reporter




B   a   r   l   o   w
Raising the Bar
Reporting & Video Services, LLC
620 Washington Street
Covington, Kentucky  41011
(859) 261-8440

1                          INDEX

2                                           Page

3   Direct Examination by Mr. Mando            4

4   Cross-Examination by Mr. Roach            27

5   Further Direct Examination by Mr. Mando   29

6

7                 NO EXHIBITS WERE MARKED

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        The deposition of Megan Elizabeth Sprague,

2   taken for the purpose of discovery and/or use as

3   evidence in the within action, pursuant to notice,

4   heretofore taken at the office of Adams Law, PLLC,

5   40 West Pike Street, Covington, Kentucky, on

6   November 3, 2022 at 2:00 p.m., upon oral

7   examination, and to be used in accordance with the

8   Kentucky Rules of Civil Procedure.

9

10                    *  *  *  *  *  *  *  *

11                       APPEARANCES

12

13  REPRESENTING THE PLAINTIFF:

14  Christopher D. Roach, Esq.

15

16  REPRESENTING THE DEFENDANTS:

17  Jeffrey C. Mando, Esq.

18

19  REPRESENTING MEGAN ELIZABETH SPRAGUE:

20  Gregory Coulson, Esq.

21                    *  *  *  *  *  *  *  *

22

23

24

25

1          MEGAN ELIZABETH SPRAGUE, after having been

2    first duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. MANDO:

5          Q.   Ms. Sprague, I introduced myself to you

6    just a few minutes ago, my name is Jeff Mando.  I'm

7    an attorney.  I represent Covington Police Officers

8    Doug Ullrich and Mark Richardson.  They've been sued

9    in a case that's pending in federal district court

10   by Jeff Cundiff, and it involves a traffic stop and

11   events that occurred on June 8, 2020.  So, a little

12   over two years ago.

13          Have you ever had your deposition taken

14   before?

15          A.   No.

16          Q.   Okay.  Let me just go over a few ground

17   rules that I think will make you feel more

18   comfortable.  I'm going to ask you a series of

19   questions focused on that night, okay?

20          A.   Okay.

21          Q.   If my question doesn't make sense, or you

22   don't understand it, probably because I poorly

23   worded it, you tell me and I will reword the

24   question, I'll repeat, I'll rephrase it, because I

25   want to make sure you understand exactly what I'm

1    being asked of you, okay?

2         A.    Okay.

3         Q.    Secondly, try and let me finish my

4    question before you begin your answer, so you know

5    exactly what's being asked.

6         A.    Okay.

7         Q.    I promise, Mr. Roach will promise to let

8    you finish your answer before we begin our next set

9    of questions, okay?

10        A.    Okay.

11        Q.    If you can, try and keep your voice up.

12   Answer questions yes or no, as opposed to a gesture

13   so the court reporter, Ms. Barlow, can capture your

14   testimony correctly.

15        A.    Okay.

16        Q.    Okay.  I don't expect to be here very

17   long, but if you need to take a break to consult

18   with your lawyer, all you have to do is say you'd

19   like to take a break and we will accommodate you.

20        A.    Okay.

21        Q.    Okay.  And you understand that you are

22   under oath here today.  There's no difference

23   testifying here in my office than if you were

24   actually in a courtroom.

25        A.    Okay.

1      Q.   All right.  Just a little background then.

2   Give us your full name and spell your last name.

3      A.   Megan Elizabeth Sprague, and it is

4   S-P-R-A-G-U-E.

5      Q.   All right.  And is it M-E-G-A-N or

6   M-E-G-H-A-N?

7      A.   M-E-G-A-N.

8      Q.   All right.  Okay.  What is your current

9   address, Ms. Sprague?

10     A.   10410 Vicksburg Lane, Independence,

11  Kentucky.

12     Q.   And how long have you lived at that

13  address?

14     A.   On and off again, but it's my childhood

15  home.  It's my parents' home.

16     Q.   Parents' home?

17     A.   Yeah.

18     Q.   And just in case we ever needed to locate

19  you for purposes of trial, what are your parents'

20  names?

21     A.   Chris Sprague, is C-H-R-I-S.

22     Q.   Okay.  Is that your father?

23     A.   That's my mom.  It's really Christiana,

24  but --

25     Q.   All right.  That's your mother?

1       A.    That's my mom, yeah.

2       Q.    Okay.

3       A.    And then John Sprague, J-O-H-N, is my dad.

4       Q.    And how old are you, Ms. Sprague?

5       A.    I'm 29.

6       Q.    Where were you living on June 8 of 2020,

7    which was the night of this traffic stop?

8       A.    1614 Euclid Avenue.

9       Q.    Whose residence was that?

10      A.    That's Jeff's dad's house.

11      Q.    Do you know his father's name?

12      A.    It's the same, Jeffrey Cundiff.

13      Q.    How long had you lived at that residence

14   with Jeff Cundiff?

15      A.    About -- I would say six to nine months.

16   It was a while.

17      Q.    Okay.  And do you recall when you moved

18   out of 1614 Euclid?

19      A.    Yeah.  It was May 16th of -- not last

20   year, so --

21            MR. COULSON:  Two years ago would have

22      been 2020.

23      A.    So 2021.

24      Q.    2021?

25      A.    Yeah.  So last May.

1      Q.   Okay.  Who else lived at that residence on

2   June 8, 2020, the one at 1614 Euclid, besides

3   yourself, Jeff Cundiff, and his father?

4      A.   Nobody.

5      Q.   Nobody else?

6      A.   Just us, yeah.

7      Q.   All right.  Do you work?

8      A.   I do at Texas Roadhouse.

9      Q.   Texas Roadhouse.  Which one?

10     A.   The Ft. Wright one.

11     Q.   Okay.  The one there that's kind of tucked

12   up against the hill?

13     A.   By Walmart, yeah.

14     Q.   And what do you do for Texas Roadhouse?

15     A.   I serve and I bartend there.

16     Q.   How long have you worked there?

17     A.   A little over a year.  Probably about 15

18   months now.

19     Q.   Do you recall where you were working on

20   June 8th of 2020?

21     A.   I wasn't working.

22     Q.   Okay.  Temporarily unemployed at that

23   time?

24     A.   Yes.

25     Q.   How far did you go in school, Ms. Sprague?

1          A.    I graduated high school.

2          Q.    Simon Kenton?

3          A.    Yeah, Simon Kenton.

4          Q.    What year did you graduate?

5          A.    2011.

6          Q.    All right.  So when did you first meet

7    Jeff Cundiff?

8          A.    2015.  2014.  2015.

9          Q.    All right.  And I think you said you moved

10   in with him, what, sometime in late 2019?

11         A.    Yeah.  So it would have been before the

12   incident.  So I had probably been there since

13   February.  So, yeah, it's about February.

14         Q.    Okay.  And so were you romantically

15   involved with Jeff Cundiff?

16         A.    Yes.

17         Q.    So just so I've got it in my mind, give

18   me, and if there were breakups in between I

19   understand, but generally, when did you start dating

20   him, and when did it end?

21         A.    So 2014, when we met, and it ended May --

22   the day I left in 2021.

23         Q.    Okay.  And during that -- during that one

24   period of that time you were living with him, right?

25         A.    Yeah.

                                                                    Page 10

1        Q.   Okay.  Until you moved out in May of 2021?

2        A.   Yeah.

3        Q.   Okay.  Let's get to the heart of the

4   matter.  Let's talk about June 8, 2020.  The traffic

5   stop that's at issue occurred somewhere near May and

6   Linden over by the cemetery?

7        A.   Yeah.

8        Q.   And it was sometime around 2:15, 2:30 in

9   the morning.  Does that sound familiar to you?

10        A.   Yeah.

11        Q.   Do you recall what you were doing the

12   night of June the 7th?

13        A.   June the 7th?

14        Q.   Right.  In other words --

15            MR. COULSON:  Before midnight of that

16        night.

17        A.   Oh, before --

18        Q.   Yeah.  The traffic stop was like at 2:15

19   or 2:30 in the morning.  I'm interested in what you

20   were doing from like 6:00 on the 7th until the time

21   of the traffic stop.

22        A.   Oh, well --

23        Q.   If you remember.

24        A.   We were at his house, probably.  I mean,

25   we were always at his house getting, just, I don't

                    Barlow Reporting & Video Services, LLC
                            (859) 261-8440

1  know.  I don't know about that night.  I mean, we

2  were at his house.  I'm sure we went to -- if we

3  ever left, it was to either like go get cigarettes

4  or food.  I mean, we pretty much lived in that house

5  and didn't leave that room.

6      Q.   Do you know where you were headed, or

7  where you were coming from at the time that the

8  police pulled Jeff's car over?

9      A.   No.  I don't really remember.

10      Q.   Okay.  Before -- do you recall the traffic

11  stop, itself, generally?

12      A.   Yes, I do.  After -- yeah, I remember

13  getting pulled over.

14      Q.   And was Jeff, in your opinion -- let me

15  ask it this way, first, and then we'll break it

16  down.  To your knowledge, from what you recall, did

17  Jeff take any illegal drugs that night before he

18  drove?

19      A.   We both were high.

20      Q.   And do you know what he was taking?

21      A.   Not like specifically.  There was always a

22  bunch of different drugs that we would take.  And

23  drinking and --

24      Q.   All right.  So both of you were high?

25      A.   Yes.

1       Q.   All right.  And was it, to your knowledge,

2    when you say there was a bunch of drugs available,

3    was he taking pills or was he smoking marijuana?

4    Was he snorting cocaine?  To the extent you can

5    recall?

6       A.   I would say there was probably all of

7    them.  Different ones, yeah.

8       Q.   But he was definitely taking drugs that

9    night?

10      A.   Yeah.

11      Q.   And --

12           MR. COULSON:  Can I interrupt just for a

13           second.  If you don't know, don't -- just say

14           you don't know.  Don't guess.  Okay.

15           MR. MANDO:  Right.  I'm the same way.

16           I'm not trying to -- we're just trying to get

17           to the facts.

18           MR. COULSON:  I don't really want to

19           interrupt, but it sure seems she's unsure, and

20           I don't guess.  If you don't know, just say

21           you don't know.

22    BY MR. MANDO:

23      Q.   Okay.  What I hear you saying is --

24      A.   I don't know what we took, but it can be

25    assumed that we were under the influence because

1    that is just, was my life back then.  So I don't

2    know if it was right before, or after, or what time

3    of the day it was, you know.  But I do know that on

4    each day it could have, you know what I mean, it's

5    just...

6         Q.   And if I hear -- what I hear you saying

7    is, that you have a recollection of both of you

8    being high at the time of the traffic stop.  You

9    just can't recall what drugs were consumed,

10   specifically?

11        A.   Yeah.

12        Q.   Is that a fair statement?

13        A.   Yeah.

14        Q.   All right.  What do you recall, if

15   anything, about the traffic stop?

16        A.   I know he got pulled over.  We got pulled

17   over.  The cop came to the car.  Pulled us over.

18   Asked why we didn't stop.  And I don't really

19   remember like exactly.  I know that he wanted to

20   search the car.  They searched the car.  They took

21   me out of the car.  They took him out of the car.

22   I'm pretty sure dogs came there.  They searched me.

23   I'm pretty sure like a lady came, because she

24   searched me.  And I know that they put me off to the

25   side from the car and she searched me.  Behind, I

1    know that they searched Jeff.  I don't really know

2    like what, I mean.  I don't know.  I didn't hear

3    anything crazy happen there, or anything like out of

4    the normal.  I know that we got to go home

5    afterwards.  I know it took a while while we were

6    there because they searched the car, us, and the

7    dogs came.  And then that's pretty much it.

8         Q.   Let me kind of walk through it.  And

9    again, if you don't recall the details, or you don't

10   remember, you tell me, but I'm going to kind of

11   start at the beginning.

12         So do you recall the scene -- the lights

13   of the cruiser illuminating and/or hearing a siren

14   before Jeff pulled the car over?

15         A.   I remember us getting pulled over, so I

16   guess so, yeah.

17         Q.   All right.  And do you recall -- do you

18   have any recollection of Jeff's actions in the car?

19   He was the driver of the car, correct?

20         A.   He was driving.

21         Q.   And you were in the front passenger seat?

22         A.   Yeah.  I was in the passenger seat.

23         Q.   Do you recall any of Jeff's actions once

24   the lights were illuminated, the siren on, before he

25   was pulled over?  I'm specifically asking you

1    whether you observed any actions, movements of his

2    inside the vehicle before the car stopped?

3        A.    I know that he drove a little bit before

4    he stopped.  He didn't want to stop.

5        Q.    He didn't stop immediately?

6        A.    Yeah.

7        Q.    All right.  Do you know why he didn't stop

8    immediately?

9        A.    No.

10        Q.    Were you asking him to stop?

11        A.    Yeah.  I told him that he should have

12    stopped.

13        Q.    So eventually, he did stop?

14        A.    Yeah.

15        Q.    All right.  So other than taking a while

16    to pull his vehicle over, do you recall whether or

17    not Jeff was moving around, jostling on the car

18    seat, you know, moving from side to side at all?  Do

19    you have any recollection of that?

20        A.    Not really.

21        Q.    All right.  When the officer -- after Jeff

22    pulled over, I assume the officer approached the

23    vehicle?

24        A.    Yeah.

25        Q.    What was the, to the best of your

1   recollection, was the officer respectful?

2       A.   I don't remember him being like mean, or

3   like anything that would stand out as far as like --

4   I don't know, but --

5       Q.   Nothing stands out in your mind about

6   anything the officer said that you felt was

7   inappropriate or improper?

8       A.   No.

9       Q.   Did he ask Jeff questions about why he

10  didn't pull over right away, if you recall?

11      A.   I don't know.  Well, I don't really know.

12  I know -- I don't know.

13      Q.   Okay.  And I realize, again, back to what

14  your attorney said, we're going back in time.

15      A.   Yes.

16      Q.   And if you were high --

17      A.   Blurry.

18      Q.   -- and Jeff was high, yeah, if you don't

19  remember the details, you just tell me, okay?

20           Do you know if the officer who pulled you

21  over, did he ask you all to step out of the vehicle?

22      A.   Well, yeah, because we got out of the

23  vehicle, so yeah.

24      Q.   And do you recall any direction or action

25  between that officer who pulled the car over and

1    yourself?  Do you recall any conversation with him,

2    specifically?

3         A.   Not specifically.

4         Q.   Okay.

5         A.   Not specifically.

6         Q.   Did you recall whether the officer told

7    you and/or Jeff why he was asking you to step out of

8    the car?

9         A.   No.  I mean, I think because he wanted

10   to -- I think he thought we were --

11            MR. COULSON:  What you remember.  Not --

12        don't guess.  If you remember the officer

13        saying something, then you say it.  But if you

14        don't remember, just say I don't remember.

15        A.   I don't remember words, exact words that

16   he used.

17        Q.   I think you said that at some point after

18   you had stepped out of the vehicle, do you recall

19   whether or not the officer who pulled the car over,

20   which we know was Officer Doug Ullrich, whether he

21   did any type of search of you at that point?

22        A.   No.  I don't think he searched me.  I

23   don't think he did.  I do remember there being a

24   girl there, because she used to be a C.O. at a jail.

25   So I remembered her being there.

1      Q.   All right.  And we've seen the body-worn

2   camera footage.  There was a female that came, and I

3   think --

4      A.   Okay.

5      Q.   -- did a brief search of you.

6      A.   Yeah.

7      Q.   All right.  Do you recall when in the

8   sequence of events that a dog arrived on the scene?

9      A.   Yeah, I don't know if that was before or

10   after, but I remember the dogs coming, yeah.

11      Q.   Did you see the officer, the K-9 handler,

12   the officer who had the K-9 --

13      A.   Yeah.

14      Q.   -- did you see him do the K-9 search of

15   the vehicle, the exterior of the vehicle?

16      A.   Yeah.  The dogs, yeah.

17      Q.   Did you hear anybody say that the dog had

18   alerted on the car?

19      A.   I don't know.

20      Q.   You didn't hear anything?

21      A.   No.  I assumed they did, but I didn't hear

22   them say anything.

23           MR. COULSON:  Again, one more time, you

24      have to speak up so that they can hear you.

25           THE WITNESS:  Okay.

1          MR. COULSON:  They're recording this, and

2     don't assume.  Either you remember or you

3     don't, okay?

4          THE WITNESS:  Okay.

5     Q.   Okay.  When the K-9 was being walked

6     around the car, which I think you said you saw --

7     A.   Yeah.

8     Q.   -- do you recall where you were located?

9     A.   No.

10    Q.   At some point did you observe officers

11    searching the interior of Jeff's vehicle?

12    A.   Yeah.  They did search the inside, and the

13    car.

14    Q.   And that was before they conduct -- the

15    female officer searched you?

16    A.   I don't know if it was before or after.

17    Q.   Then I think you said that you assume that

18    the officers searched Jeff after he had gotten out

19    of the vehicle?

20    A.   Yeah.

21    Q.   Did you personally see either -- any of

22    the officers that were there search Jeff?

23    A.   No.  No.  I was off to the side.

24    Q.   Okay.  Did you see any officer reach his

25    hand either down the front or back of Jeff's

1   athletic shorts?

2       A.   No.

3       Q.   All right.  And you didn't overhear any

4   exchange between Jeff and the officer about the

5   search?

6       A.   No.

7       Q.   Because you were off and separated from

8   Jeff at the time; is that right?

9       A.   Yeah.

10      Q.   When the female police officer searched

11  you, Ms. Sprague, tell me the best of your

12  recollection how she did that.

13      A.   Well, she went under my shirt and felt,

14  and that was pretty much it.

15      Q.   Okay.  Had you been searched like that

16  before?

17      A.   Yeah.

18      Q.   Anything inappropriate or improper that

19  you observed in the manner in which that female

20  officer searched you?

21      A.   No.

22      Q.   Did she say anything to you as we -- do

23  you recall her saying anything to you as we sit here

24  today --

25      A.   No.

1      Q.    -- two years after the fact?

2      A.    Any -- no.  No.  Like anything like -- no.

3            MR. COULSON:  Do you remember her saying

4      anything to you?

5      A.    No.  I mean, I know we talked for a bit,

6  but...

7      Q.    All right.  Just chitchat?

8      A.    Yeah.  It wasn't anything about what was

9  going on or anything.

10     Q.    Then at some point you were allowed to

11  leave, correct?

12     A.    Yeah, we left.

13     Q.    And so you got back in the car with Jeff?

14     A.    Yeah.

15     Q.    Did you go back to Jeff's house?

16     A.    Yeah.

17     Q.    All right.  When you got back in the car

18  and drove to Jeff's house, did he complain to you

19  about anything the officers did?

20     A.    Not then.  No.

21     Q.    He didn't say anything that night?

22     A.    No.  I mean, he was aggravated, but he

23  didn't say anything, like -- you know, he didn't say

24  anything.

25     Q.    Did he appear overly emotional as you rode

Page 22

1    from the scene of the traffic stop back to the house

2    on Euclid?

3         A.   Not that I remember.  No.

4         Q.   Did he -- specifically, did he complain

5    about the manner in which the officer searched him

6    as you drove back to the house?

7         A.   No.

8         Q.   All right.  Did you ever have to testify

9    in any court proceeding, or any hearing about that

10   traffic stop before coming here today?

11        A.   No.

12        Q.   All right.  Did Jeff ever tell you what

13   happened to the citation he was given for that

14   traffic stop?

15        A.   No.

16        Q.   Do you have any recollection of how long

17   you guys were at the scene?  In other words, from

18   the time Jeff pulled the car over to the time that

19   you were allowed to leave, do you have any idea

20   about how long that lasted?

21        A.   No, not exact.  Not exactly.  I feel like

22   we were there a while, but...

23        Q.   And throughout the course of the traffic

24   stop, did you hear or observe the police officer who

25   pulled Jeff over say anything that you felt was out

1   of line?

2          A.    No.

3          Q.    And did you see or hear that officer act

4   in any way in a disrespectful manner to Jeff or to

5   you?

6          A.    No.  Not that I remember.

7          Q.    Do you have any recollection of Jeff --

8   give me one minute -- calling the officer a dick

9   sucker or cocksucker?

10         A.    No, but I'm sure he did.  I don't know.  I

11  didn't hear him.  No.  No.

12         Q.    No recollection --

13         A.    No.  No.

14         Q.    -- but you say I'm sure he did?

15         A.    No.  I don't know.

16         Q.    All right.  Did you have any conversations

17  with the officer who brought the K-9 to search the

18  vehicle?

19         A.    I don't think so, no.

20         Q.    Okay.  And for the record, that's Officer

21  Mark Richardson.

22         A.    Okay.

23         Q.    Do you --

24         A.    I don't know that name.

25         Q.    During the course of the entire traffic

1   stop, did you hear Jeff object to being searched in

2   any way?

3        A.   Not that I remember.

4        Q.   Okay.  When you got back to the house on

5   Euclid, do you recall what you guys did?

6        A.   No, not really.

7        Q.   I'm sorry, ma'am?

8        A.   No, not really.  No.

9        Q.   Okay.  To your knowledge, were there any

10  illegal drugs in the car?

11       A.   Not to my knowledge.

12       Q.   Do you know if Jeff had any illegal drugs

13  on his person?

14       A.   I don't know if he did, or if he didn't.

15       Q.   Okay.  Did -- because you were living with

16  Jeff, and based on that time in your life, was Jeff

17  regularly taking illegal drugs?

18       A.   Yes.

19       Q.   On a daily basis?

20            MR. COULSON:  You have to speak up.

21       A.   Yes.

22       Q.   Okay.  I think you mentioned that you were

23  engaged in that activity, too, but have you managed

24  to kind of kick that habit or stay clean?

25       A.   When I left on that day in May, I've been

1    sober since I left, yeah.

2        Q.   Well, congratulations.  What is that, 18,

3    19 months now?

4        A.   Yes.  A year and a half.  Yeah.

5        Q.   Was Jeff still taking drugs at the time?

6        A.   Yeah.

7        Q.   In May of 2021?

8        A.   Yeah, we both were.  I left while he was

9    at work and snuck out of the house.

10       Q.   What was the reason for leaving Jeff?  Why

11   did you end it and move out in May of 2021?

12       A.   I was scared.  I wanted my life back.  I

13   couldn't live like that anymore.  We just didn't

14   have a good relationship.  And --

15       Q.   Was he abusive?

16       A.   Yeah.

17       Q.   Was Jeff Cundiff abusive to you?

18       A.   Yeah.

19       Q.   Did you ever seek domestic violence

20   orders?

21       A.   Yeah.  I got denied.

22       Q.   Okay.

23            MR. MANDO:  Give me one second.

24       Q.   Have you spoken with Jeff since you moved

25   out in May of 2021?

Page 26

1      A.    No.

2      Q.    Having lived with Jeff and dated him for

3  some time, do you believe he'd lie to serve his own

4  interest?

5            MR. COULSON:   If you know.

6      A.    I mean, I don't know I guess for sure, but

7  I mean, he's lied to me.  But I don't know.  I don't

8  know.

9      Q.    Okay.  Did Jeff ever make any statement to

10  you that he felt that the June 8, 2020 traffic stop

11  we've been discussing, that the officer pulled him

12  over in retaliation for some prior traffic stop that

13  Jeff had been involved in where he beat it?

14     A.    The next day he said something about that

15  it being like inappropriate.  I think he made a

16  Facebook post about it, and that was pretty much the

17  end of that.

18     Q.    Okay.  I take it you guys didn't talk

19  about it regularly, or at all?

20     A.    No.  Not really.  He didn't really like to

21  talk too much stuff to me about --

22            MR. ROACH:   Jeff, do you mind if I ask

23        just to clarify, the Facebook post; was that a

24        Facebook post that Jeff made or Facebook post

25        that one of the officers made?

 1           THE WITNESS:  Oh, Jeff made.

 2           MR. MANDO:  I think that's all the

 3      questions I have, Ms. Sprague.  Thank you for

 4      coming in today.  Now, Mr. Roach has the

 5      opportunity to ask you some questions, okay?

 6           THE WITNESS:  Okay.

 7           MR. MANDO:  Thank you.

 8           MR. ROACH:  I don't have that many.  This

 9      will be pretty quick.

10           THE WITNESS:  Okay.

11                     CROSS-EXAMINATION

12 BY MR. ROACH:

13      Q.   So you mentioned the Facebook post.  Did

14 Jeff ever talk about Officer Ullrich's search of him

15 being inappropriate at any time?

16      A.   He said that in the Facebook post, yeah.

17      Q.   Do you recall anything that was in the

18 Facebook post?

19      A.   I know that he said that he could sue the

20 police department.  It was a pretty long vulgar

21 post.

22      Q.   Did he go into details about why he could

23 sue them?

24      A.   I think he said it was -- something

25 happened when he searched him.  That they're always

1    out to get him.  That's a general -- you would have

2    to see the post on his Facebook, but...

3        Q.   During the points after the cop had turned

4    on his lights to that little bit of time, the 23

5    seconds, whatever it was, to the stop -- until the

6    actual stop, at any point did you see Jeff flip the

7    officer off?

8        A.   No.

9        Q.   Did you ever see him kind of like getting

10   up out of his seat a little bit to, you know, do or

11   reach for something?

12       A.   No.

13       Q.   Did you see him at any point try to hide

14   a -- some drugs in his butt?

15       A.   No.

16       Q.   Do you know if Jeff had any drugs on him

17   at that time?

18       A.   I don't know.

19       Q.   And then when the search for you was

20   conducted, was there at any point did the female

21   officer reach her hand under your underwear?

22       A.   No.

23            MR. ROACH:  That's all I have.

24            MR. MANDO:  I have two follow-ups.

25                 FURTHER DIRECT EXAMINATION

1    BY MR. MANDO:

2         Q.    Would you still have access to, or be able

3    to pull up that Facebook post that you've identified

4    from Jeff?

5         A.    He's blocked on all of my stuff on mine.

6         Q.    All right.  So we'd have to do it some

7    other way to try and retrieve it?

8         A.    Yeah.  Go onto his Facebook or something

9    like that, yeah.

10        Q.    Okay.  And when Mr. Roach was asking about

11   whether you saw -- what you saw in terms of

12   activities, and Jeff's actions between the time that

13   the police lights came on and you pulled over, and

14   you said, well, you didn't see him flip him off, and

15   you didn't see him moving around, am I correct that

16   you just don't recall one way or the other?

17        A.    Yeah.  I just don't -- yeah.  I just don't

18   remember, like I don't really --

19        Q.    Those details were not important --

20        A.    Okay.

21        Q.    -- to you at the time; is that fair?

22        A.    Yeah, I was more concerned that we were

23   getting like pulled over, you know what I mean.

24        Q.    Or go to jail?

25        A.    Because he was -- yeah.

Page 30

1              MR. MANDO:   Okay.   Thank you,

2        Ms. Sprague.   That's all I have.   I appreciate

3        it.

4                                (Witness excused)

5    (The deposition ended at approximately 2:25 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 31

1                                    )

2    COMMONWEALTH OF KENTUCKY          )

3                                    )

4

5           I, Tina M. Barlow, Notary Public for the

6    Commonwealth of Kentucky, do hereby certify:

7           That the witness named in the deposition, prior

8    to being examined, was by me, first duly sworn;

9           That said deposition was taken before me at the

10   time and place therein set forth and was taken down

11   by me in shorthand and thereafter transcribed into

12   typewriting under my direction and supervision;

13          That said deposition is a true record of the

14   testimony given by the witness and of all objections

15   made at the time of the examination.

16          I further certify that I am neither counsel for

17   nor related to any party to said action, nor in any

18   way interested in the outcome thereof.

19          IN WITNESS WHEREOF I have subscribed my name

20   and affixed my seal this 14th day of November, 2022.

21

22

                         TINA M. BARLOW
23                       Notary Public
                         Notary ID KYNP60230
24                       My Commission expires: 11/6/26

25